[No. D058046. Fourth Dist., Div. One. Dec. 5, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ABDI MOHAMED, Defendant and Appellant.

516

**COUNSEL**

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steve Oetting, Kristine A. Gutierrez and Alana R. Butler, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McCONNELL, P. J.—**

### INTRODUCTION

A jury convicted Abdi Mohamed of robbery (Pen. Code, § 211).[1] The trial court sentenced him to five years in state prison. Mohamed appeals, contending there is insufficient evidence to support the jury's verdict. He also contends the trial court erred by instructing the jury on conspiracy because conspiracy is not a valid theory of criminal liability. We conclude these contentions lack merit and affirm the judgment.

### BACKGROUND

*Prosecution Evidence*

Around 12:45 a.m., Breanna Gomez was leaving a café when someone pushed her friend against her. Gomez fell against a wall. She heard someone refer to her and her friend as "b—s." She turned and saw three men wearing sheer, form-fitting masks. She felt an object she thought was a gun in her back and was pushed back against the wall. One man's mask ended up between his nose and lower lip. Gomez could see the man's jawline and

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

facial structure, including the shape of his chin, cheek, and nose. He was Black, approximately six feet tall and thin. He had a moderate beard defining his jawline. He wore a black hooded sweatshirt, light colored pants, and a black beanie. He took her cell phone, car keys, and a $20 bill. One of the men also took her purse. Gomez then ran back into the café.

The owner of the café was standing with some customers outside the café when a man walked up. The man asked if the people outside were gang banging, and when he learned they were not, he pulled a mask over his entire face and drew what appeared to be a gun. The man walked over to another group of people that included Gomez and her friend. Meanwhile, the owner went into the café and called 911. During the 911 call, the owner described the man he saw as a six-foot tall Black man around 25 years old. The man had a medium build and wore black pants, a black shirt, and a black-and-white striped jacket.[2]

Another unidentified person told the 911 operator one of the robbers was Black and wore a black shirt, a black hooded sweatshirt, and gray sweats. The man also wore a black beanie as a mask. The unidentified person said one of the other robbers was wearing a Spiderman backpack.

Froilan Medina was inside the café when the incident occurred. He saw a Black man walk up to the restaurant and pull a black beanie mask down to his mouth area. The man was between five feet 10 inches and six feet tall. He had a thin patch of hair on his chin and was wearing dark pants and a red hooded sweater with designs.[3]

Medina went out of the restaurant and saw the man run away with two other Black men following him. One of the followers was around six feet tall and wore a mask, a black and gray hooded sweatshirt, and black baggy sweatpants. The other man wore a black hooded sweatshirt and gray sweatpants. He dropped what appeared to be a gun and went back to pick it up. Police officers found a magazine for a toy pistol in the same area. DNA testing of the magazine was inconclusive as there was not enough DNA for a comparison.

One of the police officers who responded to the incident drove around the neighborhood looking for suspects. Shortly after the robbery, the officer saw Mohamed walking along a street approximately four blocks from the café and

---

[2] At trial, the owner described the man's jacket as black with white stars.

[3] On the night of the incident Medina told a police officer the man was wearing a black hooded sweatshirt with a red design.

holding an umbrella in a manner that partially blocked his face.[4] Mohamed wore gray sweatpants,[5] a black hooded sweatshirt, a beanie, and a neck scarf.[6] The officer detained Mohamed, confirmed he fit the description of one of the robbers, and conducted curbside lineups with Gomez and two other witnesses.

Gomez told the officer who brought her to the lineup that she was 80 percent sure Mohamed was one of the men who robbed her because he was wearing the same clothing and had the same facial hair, facial features and build.[7] She could not be 100 percent sure because the men were wearing masks. Gomez later identified Mohamed as one of the robbers at both the preliminary hearing and the trial.

Medina also identified Mohamed as one of the robbers at the curbside lineup. At the time, he said he was "completely sure" about his identification because Mohamed was wearing the same clothes as one of the robbers. At trial, he said he had "a little bit" of doubt about his identification, but remained confident in it. The owner of the café said Mohamed was not the person he saw.

After Gomez and Medina identified Mohamed as one of the robbers, the officer arrested Mohamed and advised him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. The officer searched Mohamed and found a nylon "do-rag" tucked between his body and his pants.

Mohamed told the officer he was coming from a friend's house where he had been playing video games since 5:00 p.m. The officer went to the friend's house, and the friend's mother told the officer she had not seen her son since about 1:00 p.m. and Mohamed had not been at her house after 5:00 p.m. playing video games. The following day the friend spoke with the officer and confirmed he had not seen Mohamed after 5:00 p.m. the prior evening. At trial, the friend testified he had been with Mohamed until dark, then they split up. He was not with Mohamed after then, and Mohamed was not at his house playing video games until 1:00 a.m.

---

[4] Neither Gomez nor Medina indicated in their initial descriptions that the robber they identified as Mohamed had an umbrella. At trial, Gomez testified he did not have an umbrella.

[5] The pants apparently had black stripes along the side. Neither Gomez nor Medina indicated in their initial descriptions the pants of the robber they identified as Mohamed had black stripes.

[6] Neither Gomez nor Medina indicated in their initial descriptions that the robber they identified as Mohamed was wearing a neck scarf; however, the scarf was not visible because the black hooded sweatshirt was zipped up to Mohamed's neckline.

[7] Gomez did not mention the robber's facial hair in her initial description of him.

*Defense Evidence*

Dr. Scott Fraser, an eyewitness identification expert, testified there are several variables affecting the accuracy of eyewitness identifications. These variables include lighting, distance, and duration of exposure. Generally, the better the lighting, the shorter the distance, and the longer the duration of exposure the more likely an eyewitness identification is to be accurate. In addition, very small obstructions in a witness's view of the perpetrator, such as a partial face mask, can greatly reduce the accuracy of the witness's identification. Likewise, when there is more than one person involved in an incident, the rates of correctly recognizing any single person are significantly reduced. Stress can also affect the accuracy of eyewitness identifications. In very high stress situations, the accuracy of eyewitness identifications drops off rapidly.

Conversely, the existence of distinctive cues, such as tattoos or scars, increases the accuracy of eyewitness identifications. If an eyewitness describes a perpetrator as having a scar in a particular place, the perpetrator will almost certainly have a mark or aberration in that place. If an eyewitness gives a description that omits a distinctive cue, such as the existence of facial hair on the chin, then the perpetrator's chin almost certainly did not have facial hair.

Errors in cross-racial identifications are two to two and a half times higher than same race identifications. Moreover, the errors in cross-racial identifications are almost exclusively false positives, e.g., saying a person is the perpetrator when the person is not the perpetrator.

Of the three recognition tests most commonly used by law enforcement officers—curbside lineups, photo lineups, and live lineups—curbside lineups have the highest error rate and are the least reliable. Like the errors in cross-racial identifications, the errors in curbside lineups are almost exclusively false positives. The error rates are especially high if the person displayed is the same race, size, and gender and is wearing clothing similar to what the perpetrator was seen wearing.

Moreover, once a witness makes an identification, whether through a curbside lineup or other method, the witness is predisposed to identify the same person again. Consequently, any subsequent identification of the same person, such as at a preliminary hearing or a trial, is not an independent assessment. Furthermore, if a witness does not specifically state the person is or is not the perpetrator, but instead makes feature similarity declarations, such as the person has the same kind of clothes or jawline as the perpetrator, the witness's remarks would more accurately be treated as a rejection than a selection.

## DISCUSSION

### I

*Sufficiency of the Evidence Claim*

Mohamed contends we must reverse his conviction because there was insufficient evidence to show he was one of the robbers. "In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639 [114 Cal.Rptr.3d 133, 237 P.3d 474].) "Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all." (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 493 [38 Cal.Rptr. 755], citing *People v. Braun* (1939) 14 Cal.2d 1, 5 [92 P.2d 402] & *People v. Jackson* (1960) 183 Cal.App.2d 562, 567 [6 Cal.Rptr. 884]; see also *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 [263 Cal.Rptr. 328] [when the circumstances of an eyewitness identification and its weight are explored at trial and the trier of fact believes the eyewitness identification, the trier of fact's determination is binding on the reviewing court].)

In this case, the evidence showed that a short time after the robbery a police officer spotted Mohamed walking along the street four blocks from the crime scene. Mohamed fit the description of one of the robbers. During a curbside lineup, Gomez stated she was 80 percent sure Mohamed was one of the robbers because he was wearing the same clothing, had the same build, and had the same jawline and chin hair. She also identified Mohamed as one of the robbers at the preliminary hearing and at trial. During a separate curbside lineup, Medina stated he was "completely sure" Mohamed was one of the robbers because Mohamed was wearing the same clothing. After Mohamed's arrest, a police officer found a thin, nylon do-rag on him, which Gomez testified matched the fabric the robbers used to mask their faces. In

addition, Mohamed provided the officer with a false alibi, suggesting consciousness of guilt. We conclude this evidence amply supports the jury's verdict in this case.

Gomez's inability to be 100 percent certain of her curbside identification and Medina's expression of "a little bit" of doubt about his curbside identification at trial do not preclude the existence of sufficient support for the jury's verdict. "[I]t is not essential that a witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony." (*People v. Lindsay, supra,* 227 Cal.App.2d at p. 494.)

The fact that neither Gomez nor Medina saw the robbers' entire faces also does not preclude the existence of sufficient support for the jury's verdict. "[I]t is not necessary that any of the witnesses called to identify the accused should have seen his face. [Citation.] Identification based on other peculiarities may be reasonably sure. Consequently, the identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing." (*People v. Lindsay, supra,* 227 Cal.App.2d at p. 494.)

Similarly, the discrepancies between Gomez's and Medina's observations and their omission of certain information from their initial descriptions of the robber they identified as Mohamed, including his possession of an umbrella or the presence of a black stripe on the side of his pants, did not necessitate the jury's rejection of their identifications. "The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance . . . ." (*People v. Lindsay, supra,* 227 Cal.App.2d at pp. 493–494.)

Moreover, although Dr. Fraser provided the jury with information explaining how certain discrepancies and omissions might indicate an eyewitness identification is inaccurate, the jury was not obliged to accept Dr. Fraser's opinions or find them applicable in this particular case. (§ 1127b ["The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion if it shall be found by them to be unreasonable."].) Furthermore, given the closeness of Gomez's and Medina's descriptions to Mohamed's physical appearance the night of the robbery, his

proximity to the crime scene, his possession of a do-rag with similar characteristics to the masks worn by the robbers, and his false alibi, we are unable to conclude, as Mohamed asserts, that Gomez's and Medina's identifications of him were inherently improbable.[8]

## II

### *Instructional Error Claim*

Among the instructions it gave the jury, the trial court included instructions on conspiracy as a potential theory of criminal liability. Defense counsel did not object to these instructions. On appeal, however, Mohamed contends the trial court committed reversible error by giving the instructions because conspiracy is not a valid theory of criminal liability. More particularly, according to Mohamed section 31 specifies two types of principals: (1) direct perpetrators and (2) aiders and abettors. Since section 31 does not specify that conspirators are principals, Mohamed contends conspiracy is not recognized as a theory of criminal liability under the Penal Code and, therefore, the prosecution's reliance on it was unlawful. He further contends long-standing case authorities accepting conspiracy as a theory of criminal liability are invalid because they do not recognize or discuss section 31's limits on who are principals. We disagree.

Under California law, a party to a crime is either a principal or an accessory. (§ 30.) The Legislature has defined principals as "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31.) The California Supreme Court has explicitly concluded this definition includes conspirators. (*In re Hardy* (2007) 41 Cal.4th 977, 1025 [63 Cal.Rptr.3d 845, 163 P.3d 853] ["One who conspires with others to commit a felony is guilty as a principal. (§ 31.)"].) Although Mohamed faults the court for failing to explain the reasons for its conclusion, the conclusion is nonetheless binding on us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)[9]

---

[8] The United States Supreme Court is currently reviewing whether the due process protections against the admission of unreliable identification evidence apply to all identifications made under suggestive circumstances, or only when the police orchestrated the suggestive circumstances. (See *Perry v. New Hampshire* (2011) 565 U.S. ___ [180 L.Ed.2d 224, 131 S.Ct. 2932]; see also <http://www.supremecourt.gov/qp/10-08974qp.pdf> [as of Dec. 5, 2011].) We had no occasion to address this issue in this appeal as Mohamed only challenged the sufficiency of the eyewitness identification evidence, not its admissibility.

[9] We are likewise bound by the court's conclusion that "[w]hen there is evidence of a conspiracy to commit the substantive offenses charged, it is not error to instruct the jury on the

Even if we were reviewing the matter in the first instance, Mohamed's arguments do not persuade us. The "all persons concerned" language in section 31 indicates the Legislature intended the definition of principal to apply broadly. (See *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529 [26 Cal.Rptr.2d 323] [§ 31 creates a bright-line rule imposing criminal liability on all persons "concerned" in the commission of a crime regardless of the degree of their involvement].) A broad application of the language would necessarily include conspirators. As one appellate court explained, " 'All persons concerned in the commission of a crime . . . are principals' and, when two or more are 'concerned,' they are bound by the acts and declarations of each other, when such acts and declarations are part of the 'transaction' in which they are engaged, because they are 'principals' and not because they are conspirators. . . . [C]onspiracy comprehends nothing that is not included in the definition of 'who are principals.' Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." (*People v. Talbott* (1944) 65 Cal.App.2d 654, 664–665 [151 P.2d 317]; accord, *People v. Durham* (1969) 70 Cal.2d 171, 184–185, fn. 11 [74 Cal.Rptr. 262, 449 P.2d 198].)

Moreover, we believe Mohamed misconstrues the language in section 31 clarifying that all persons concerned are principals regardless of "whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." This clarifying language reflects the elimination of the common law distinctions among principals in the first degree, principals in the second degree, and accessories before the fact. (See § 971 ["The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals . . . ."]; see also *People v. Beeman* (1984) 35 Cal.3d 547, 554–555 & fn. 2 [199 Cal.Rptr. 60, 674 P.2d 1318]; *Bompensiero v. Superior Court* (1955) 44 Cal.2d 178, 186 [281 P.2d 250]; *People v. Moretto* (1994) 21 Cal.App.4th 1269, 1274–1275 & fn. 5 [ 26 Cal.Rptr.2d 719]; *People v. Mitten* (1974) 37 Cal.App.3d 879, 883 [112 Cal.Rptr. 713]; *People v. Davis* (1930) 106 Cal.App. 179, 188–189 [289 P. 194]; *People v. Wood* (1922) 56 Cal.App. 431, 432–433 [205 P. 698].) Thus, instead of demonstrating a legislative intent to impose limits on the class of persons who are principals, this clarifying language demonstrates a legislative intent to remove previously existing limits. This language, therefore, provides no support for Mohamed's contention that conspiracy is an invalid theory of criminal liability under California law. In

---

law of conspiracy even though no conspiracy is charged." (*People v. Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259].)

.

view of our conclusions, we need not address the People's forfeiture argument or Mohamed's related futility argument.

## DISPOSITION

The judgment is affirmed.

Haller, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 29, 2012, S198749.