Filed 1/6/16  P. v. Revoredo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066707 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD249091) |
| RONNIE REVOREDO, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion file December 11, 2015, be modified as follows:

1.  On page 6, in the first sentence of the last paragraph, the words "L.P. and," "had" and "at the same time" are deleted, so the sentence reads: "Revoredo attended Mira Mesa High School."

2.  Also in the last paragraph on page 6, in the second sentence, the word "also" is deleted, and Footnote 2 following that sentence is deleted, so the sentence reads: "Many of the numbers L.P. did not recognize were linked to people who had attended Mira Mesa High School at that time."

3. On page 10, the second sentence of the last full paragraph, the word "frequently" is deleted, so the sentence now reads: "Revoredo called phone sex lines while they were together."

There is no change in the judgment.

The petition for rehearing is denied.

BENKE, Acting P. J.

Copies to:  All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066707 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD249091) |
| RONNIE REVOREDO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed as modified.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

In May 2014, a jury found Ronnie Revoredo guilty of burglary (Pen. Code, § 459)[1] of an inhabited building (§ 460) while another person, other than an accomplice, was present (§ 667.5, subd. (c)(21)) (count 1) and indecent exposure in an inhabited building (§ 314) (count 2). In July, the court suspended imposition of sentence and placed Revoredo on four years' probation. Revoredo appeals, contending the evidence is insufficient to identify him as the perpetrator of the crimes and the probation condition requiring him to submit to periodic polygraph examinations, with the results released to the probation department, is overbroad and violates the Fifth Amendment. We agree the probation condition violates the Fifth Amendment.

I

THE PEOPLE'S CASE

In August 2012, L.P., a graduate student, and her mother, Madelyn P., lived in a ground floor, one bedroom apartment at First Avenue and Nutmeg Street in Bankers Hill. Madelyn slept in the bedroom on a king-sized bed. L.P. usually slept on a hide-a-bed sofa in the living room. Above the hide-a-bed was a large window facing First Avenue, flanked by two smaller windows. In hot weather, L.P. and Madelyn left the smaller windows ajar and pulled back the window blinds to promote air flow into the room. There was no air conditioning in the apartment.

In August 2012, the weather was hot and humid. On the night of August 12, L.P. slept in Madelyn's bedroom, where it was cooler. L.P. went to bed around 11:00 or 11:15

---

[1]     Further statutory references are to the Penal Code.

2

p.m. and fell asleep around 12:30 or 1:00 a.m. Madelyn went to bed around midnight. She slept on the left side of the bed. L.P. slept on the right side of the bed, about one or one-and-one-half feet from the window. Both women fell into a deep sleep.

In the early morning hours of August 13, 2012, L.P. awoke to use the restroom. The clock by her bedside read 3:32 a.m.; it was 10 minutes fast. A streetlight and an outside security light admitted considerable light into the room, even though the blinds were closed. It was "pretty bright" in the room.

L.P. rolled to her right to get out of bed. She saw a man, who she later identified as Revoredo, standing over her and against the bed. He was a few inches away, facing her and positioned just below her waist. He was masturbating. L.P. saw the shape of what she thought was his penis, with his hand around the shaft. She noticed a white t-shirt, shorts that appeared to be blue plaid, gold-rimmed glasses and short hair that was "a little bit spiky." She assumed Revoredo's zipper was down because his pants "weren't down around his ankles." Light was cast around him, "like backlighting." L.P. had never seen Revoredo before.

L.P. was half asleep and in shock. She asked, "Who are you?" Revoredo grabbed her right arm with his left hand and held her arm down. He said, "Don't move." L.P. yanked her arm away. Revoredo grabbed it again and repeated, "Don't move." L.P. used her hand to pry one of his fingers back. He released her arm. L.P. said, "Mom, there's a guy in the room." L.P. grabbed a pillow and hit Revoredo with it, trying to push him away. There was no room for her to move because the bed was so close to the wall.

3

Madelyn, who was sleeping on her left side, awoke when she felt movement in the bed behind her.  She had difficulty moving because she had "an artificial hip and another bad one."  As she started to turn over to see what was happening, she heard L.P. say, "Mother, there's a man in . . . the room."  Madelyn started to sit up and saw the man standing against the bed, by L.P.'s torso.  The man was silhouetted by the light coming through the blinds.  Madelyn was focused on getting out of bed and getting the man away from L.P.  Madelyn was not able to get "a good look at [his] facial features," but did notice he had short hair and was of stocky build.  She also noticed he was "[n]ot really tall," about five feet eight or nine inches tall.  The man was wearing a t-shirt or men's undershirt.

As Madelyn started to get up, she hear L.P. say, "Oh, God, Mom, he's masturbating."  Madelyn got out of bed as quickly as she could, given her physical limitations, and screamed, "Get the F out of here.  I'm calling the police."  The man moved away from L.P. and started to walk quickly around the bed and out of the room.  By the time Madelyn made it out of bed, the man had reached the foot of the bed, on Madelyn's side, near the bedroom door.  As he left the room, with Madelyn four or five feet behind him, she caught a glimpse of his profile, the closest she had come to seeing his face.  Although there was not much light in that spot, Madelyn saw the man had a flat, small nose.  She also saw "a glint of glasses, maybe wire-rim glasses . . . ."  Madelyn did not see the man's face well enough to identify him.

Madelyn followed the man through the hall, toward the living room.  He left the house, "going quite fast."  During that time, L.P. had remained in the bedroom, sitting on

4

the bed, concerned Revoredo might have a weapon. After about 30 seconds, L.P. regained her composure and followed Madelyn. Each paused to make sure the other was okay. By the time they reached the living room and passed the entertainment center, the man was gone. The front door was wide open. Madelyn stepped outside but did not see the man.

Madelyn and L.P. discovered L.P.'s cell phone had been disconnected from the charger on the dining room table and was missing. The dining room window, facing Nutmeg Street, was wide open, although Madelyn and L.P. had left it open only about three inches. The window screen was missing. The cordless land line telephone had been unplugged and was missing. The dining room was full of bags of clothing Madelyn and L.P. planned to donate; they found the cordless telephone in a bag of clothing. They were shaking and in shock and this process took about 10 minutes. They connected the telephone and called 911 at about 3:40 a.m. L.P.'s cell phone was never found.

Police officers received L.P. and Madelyn's 911 call shortly after 3:30 a.m. on August 13, 2012, and arrived at the apartment soon after. L.P. described the intruder as White, 30 to 40 years old, five foot seven to five foot nine inches tall, of stocky build, weighing between 180 and 200 pounds, with short hair that appeared blond in the backlighting. L.P. said the intruder wore a white t-shirt, plaid shorts and gold wire-rimmed glasses.

Police detectives arrived a couple of hours later. L.P. told them the intruder was five foot six to five foot eight inches tall, with blond to brown hair and wearing shorts. In all other respects, this description matched the description she had given the officers.

5

The detectives took photographs of the bruising on L.P.'s arm caused by Revoredo's fingers. Detective Kimberly Collier took L.P. to the police station where L.P. helped detectives prepare a composite drawing. The drawing was distributed to other law enforcement agencies. L.P. viewed numerous photographic lineups, one of which included a photograph of Revoredo, but was unable to identify anyone "with 100 percent certainty."

At the detectives' request, L.P. called her cell phone provider to obtain her phone records. The police received the records a couple of days later. The records showed 71 to 73 calls had been made from L.P.'s cell phone on August 13, 2012, between 3:29 a.m., the time the intruder left the apartment, and around 5:00 a.m., when the phone was turned off. Detective Collier conducted a computer search for names associated with the telephone numbers called and called each number for which the search was unsuccessful. Detective Collier asked L.P. if she recognized the numbers and names and made a list (the list) of the many names and numbers L.P. did not recognize. Twenty-four of the calls were to 14 numbers on L.P.'s cell phone contacts list.

L.P. and Revoredo had attended Mira Mesa High School at the same time. Many of the numbers L.P. did not recognize were linked to people who had also attended Mira Mesa High School at that time.[2] Michelle Navalta was one of those people.

In the early morning hours of August 13, 2012, after 2:00 or 3:00 a.m., Navalta's cell phone rang, waking her. She saw the call was from a number in the 619 area code,

---

[2]     L.P. recognized the names of two people connected to Mira Mesa High School who had received calls from her cell phone: Tracy Herr'Marko and Mike San Agustin.

the same area code as her husband's work number. Her husband was a Coronado police officer who worked the night shift. Worried, Navalta answered the phone and said "hello." A man whispered, "Do you like big dick?" Navalta asked, "Who is this?" There was no response. Navalta hung up. The phone rang again with a call from the same telephone number. Navalta answered. The same male voice whispered, "Do you like big dick?" Navalta again asked, "Who is this?" She then said, "I have your number" and, "Please don't call again, or I'll call the police."

Navalta's husband and police detectives showed Navalta the composite drawing. Navalta said it looked like Revoredo, with whom she had attended junior high and high school and who was her Facebook friend. Navalta showed Revoredo's Facebook page to Detective Collier. Detective Collier noticed five to eight of the people on the list were Revoredo's Facebook friends.

The police discovered a link between Revoredo and another name L.P. did not recognize, Linda Willis. Willis was a friend of Revoredo's wife and had prepared tax returns for the couple. Willis received a telephone call in the early morning hours of August 13, 2012, after 3:00 a.m. When she answered the phone, the caller said, "Linda, I'm going to come and get you, and you're next." The caller used language with a sexual meaning. Willis hung up. Her phone rang again. She turned off her phone.

L.P.'s employer, Anne Wilson, received a call from L.P.'s phone around 3:00 a.m. on August 13, 2012. When Wilson answered the phone, a man's voice asked, "Is this Anne?" Wilson asked, "Who is this?" The man said, "Do you want to suck my cock?" and, "Do you want me to come in your mouth?" Wilson did not know Revoredo.

7

The police executed a search warrant and obtained Revoredo's cell phone records. The records showed two calls were placed from his phone on August 13, 2012, during the period in which L.P.'s phone was used. One of the two calls was to a sex line. The other call was to the work number of Sarah Strong, Revoredo's former coworker. Strong did not answer the phone. The caller did not leave a voicemail message. Strong sent a text message to the number, asking who had called. She received a return text stating, "Sorry, butt dial." The call to Strong began at 4:05:55 a.m., 33 seconds after a call from L.P.'s phone ended, and occurred in the same sector and utilized the same cell tower as the call made from L.P.'s phone.

On January 17, 2013, the police executed a search warrant at Revoredo's Mira Mesa home. The police found three cell phones, computer equipment, cameras, and photographs. One of the phones (the working phone) was on and had cellular service but had a damaged charging port. The second phone (the charging phone) was partially disassembled and used solely to charge the working phone. The third phone was a Blackberry (the Blackberry).

On contacts lists in Revoredo's cell phones the police found information regarding 14 people who had received 24 of the calls made from L.P.'s phone and whose names she did not recognize. Those 14 people included Navalta, Willis, Herr'Marko, Yvonne San Agustin, Ganeane Lewis, Paula Kalb, Joanne Leeboldt Ely, Amanda Hernandez, Marci Allen and Adam Nash. Some of those names had been deleted from the contacts list in the working phone. Herr'Marko and Yvonne San Agustin answered their phones but the caller said nothing. Kalb, a lender who had helped Revoredo with the purchase of a

8

house; Ely, who formerly lived near Revoredo on Third Avenue in Hillcrest; Hernandez, who had met Revoredo through a mutual acquaintance; Allen, who had hired Revoredo to create a computer program in connection with her Ph.D. dissertation; and Adam Nash, who had worked with Revoredo at a photography company for more than 10 years and whose wife also knew Revoredo did not answer their phones.

Lewis had attended Mira Mesa High School with Revoredo. They were friends on Facebook. Lewis's telephone number was on Facebook and visible to her Facebook friends. In the early morning hours of August 13, 2012, after 3:00 a.m., Lewis received a phone call. She answered the phone. Although her first name was commonly mispronounced, the caller pronounced it correctly. This led Lewis to believe she knew the caller. She asked who it was. The caller responded, "It's your new man." Lewis hung up. The phone rang a second time. Lewis's husband answered the phone and asked who was there. The caller said nothing.

Twenty-one or 22 of the calls from L.P.'s phone could not be connected to her or Revoredo. Of those calls, eight or nine were to sex lines and one was to a number similar to the number of a sex line. One of the calls was to a number close to Adam Nash's number. Eight unidentified numbers were Florida numbers, including one sex line.

In the working phone, the police found a deleted photograph that appeared to be L.P. lying on her hide-a-bed. The SIM card for one of Revoredo's phones contained a photograph of him with wire-rimmed glasses. One of his phones contained a photograph of Herr'Marko "from the backside." She had not given him permission to have the photograph.

9

Revoredo was arrested in January 2013 and released the next day. In May or June, around 5:30 p.m., L.P. was in her car, stopped at a traffic light in downtown San Diego. A group of men crossed the street and one turned around and smirked at her. She realized he was the man who had broken into her apartment. She recognized his distinct nose, which she had discussed with the police during the drawing of the composite sketch. The probation report lists Revoredo's height as five feet six inches and his weight as 160 pounds.

II

DEFENSE EVIDENCE

Revoredo's ex-wife, Serena Ling, testified Revoredo was Peruvian. Revoredo frequently called phone sex lines while they were together. They separated in 2011. Ling had not known Revoredo to wear plaid shorts, but it was difficult for her to remember every single pair of shorts he owned. It was also difficult for her to remember every single pair of glasses he owned. She did not recall that he own wire-rimmed glasses; he wore contact lenses or dark-rimmed plastic glasses. When shown a photograph of Revoredo wearing glasses with wire temples and a wire connecting the two lenses, Ling remembered those glasses. At the time of trial, in 2014, the photograph was at least eight or nine years old.

Revoredo's mother testified he never owned any plaid shorts. He had never had blond or light brown hair. He had difficulty with his legs, so when he was in a hurry, he walked fast rather than running. On August 13, 2012, around 10:00 a.m., she found him

10

asleep in his room, wearing his work uniform, a red shirt and black shorts. When he left for work the day before, he was wearing the uniform and contact lenses.

Joseph Gomes, who worked with Revoredo in Mission Beach, testified their shift usually ended around 12:00 or 12:30 a.m. When their shift ended on August 13, 2012, Revoredo was wearing his uniform, a red shirt and black shorts. He was wearing contact lenses, not glasses. After leaving work, Revoredo and Gomes went to a bar across the street and drank. Gomes left about 1:30 or 1:40 a.m. A defense investigator testified Revoredo was approximately five feet five inches tall with shoes and five feet four inches without shoes.

Kimberly Heiser testified the photograph that appeared to be L.P. lying on the hide-a-bed was actually a photograph of Heiser, taken by Revoredo. Robert Jacobson, a certified evidence photographer, testified he could not say the photograph depicted L.P.

Psychologist Mitchell Eisen specialized in memory, including eyewitness memory and suggestibility. He testified reports close in time to an event tended to be more accurate than reports given after a long period of time.

## III

## SUBSTANTIAL EVIDENCE

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the

11

judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.] [¶] ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" [Citation.]' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

" 'The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance . . . .' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522, quoting *People v. Lindsay* (1964) 227 Cal.App.2d 482, 493-494.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) " '[T]o entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all.' " (*People v. Mohamed, supra,* at p. 521.)

The facts set forth above demonstrate there is substantial evidence to identify Revoredo as the perpetrator of the crimes. L.P. identified him at the preliminary hearing

12

and again at trial. She was subject to cross examination in both instances. The description L.P. gave the police resulted in a composite sketch from which Navalta identified Revoredo.

We "accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) There was sufficient circumstantial evidence from which the jury might have logically inferred that Revoredo possessed L.P.'s cell phone immediately after the crimes. Between the time the intruder left the apartment and the time L.P.'s phone was turned off, calls were made to people known to Revoredo but not to L.P. and to a person on L.P.'s contacts list who did not know Revoredo. Several of these calls were sexual in nature and at least one was threatening. Calls were also made to sex lines, a past practice of Revoredo's confirmed by his ex-wife. During the period calls were made from L.P.'s phone, calls were also made from Revoredo's phone from the same area.

The jury could have reasonably concluded that Revoredo had time to change out of his work clothing, commit the crimes in Bankers' Hill and put his work clothing back on between the time he left the Mission Beach bar and the time his mother entered his bedroom in Mira Mesa.

IV

THE PROBATION CONDITION

Probation condition number 10h (the polygraph condition or the condition) required Revoredo to "[u]ndergo periodic polygraph examinations at the direction of the [probation officer], with the results of those tests released to the [probation officer].

13

Polygraph questions shall be limited to items <u>which are relevant to the crime(s) for which the defendant was convicted</u> and shall assist with supervision, treatment, and rehabilitative efforts. All associated costs to be borne by the defendant." Before the court imposed probation, Revoredo's counsel objected to the polygraph condition. When questioned by the court, Revoredo said he had no questions concerning any probation condition and said he accepted the terms of probation. Revoredo now contends the polygraph condition violates the Fifth Amendment and is overbroad.

Section 1203.067, subdivision (b), provides: "On or after July 1, 2012, the terms of probation for persons placed on formal probation for an offense that requires registration pursuant to Sections 290 to 290.023,[3] inclusive, shall include all of the following: [¶] . . . [¶] (2) Persons placed on formal probation on or after July 1, 2012, shall successfully complete a sex offender management program, following the standards developed pursuant to Section 9003, as a condition of release from probation. The length of the period in the program shall be not less than one year, up to the entire period of probation, as determined by the certified sex offender management professional in consultation with the probation officer and as approved by the court. Participation in this program applies to each person without regard to when his or her crime or crimes were committed. [¶] (3) Waiver of any privilege against self-incrimination and participation in polygraph examinations, which shall be part of the sex offender management program." "The effective date of [§ 1203.067, subdivision (b)(2) and (3)] was September

---

3    Revoredo's conviction of violating section 314 requires him to register as a sex offender. (§ 290, subd. (c).)

14

9, 2010, but [these] provisions did not become operative until July 1, 2012." (*People v. Douglas M.* (2013) 220 Cal.App.4th 1068, 1075.)  Section 1203.067, subdivision (b)(2) and (3) "was enacted as part of Assembly Bill No. 1844 (2009-2010 Reg. Sess.), the Chelsea King Child Predator Prevention Act of 2010 (Chelsea's Law) (Stats. 2010, ch. 219), which altered numerous statutes governing sex offenses and sex offenders." (*Douglas M.,* at p. 1076.)  Whether waiver of the privilege against self-incrimination required by 1203.067, subdivision (b)(3), violates the Fifth Amendment of the United States Constitution is pending review before the California Supreme Court.  (E.g., *People v. Friday* (2014) 225 Cal.App.4th 8, review granted July 16, 2014, S218288; *People v. Garcia* (2014) 224 Cal.App.4th 1283, review granted July 16, 2014, S218197; *People v. Klatt* (2014) 225 Cal.App.4th 906, review granted July 16, 2014, S218755; *People v. Rebulloza* (2015) 234 Cal.App.4th 1065, review granted June 10, 2015, S225503.)

Before the enactment of section 1203.067, subdivision (b)(2) and (3), this court considered whether requiring polygraph examinations as a condition of probation violates the Fifth Amendment privilege against self-incrimination.  In *Brown v. Superior Court* (2002) 101 Cal.App.4th 313, this court rejected the defendant's "contention that a polygraph condition is per se invalid and illegal." (*Id.* at p. 319.)  "In so ruling, [this court] reject[ed] [the defendant's] contention that imposing polygraph testing as a condition of probation violates his rights and privileges under the Fifth . . . Amendment[] to the United States Constitution." (*Id.* at p. 320.)  This court stated:  "The fact that Brown has a duty to answer the polygraph examiner's question truthfully does not mean his answers are compelled within the meaning of the Fifth Amendment." (*Brown,* at

15

p. 320, citing *People v. Miller* (1989) 208 Cal.App.3d 1311, 1315 and *Minnesota v. Murphy* (1984) 465 U.S. 420, 427, 429.)  "Brown has misconstrued the nature of the privilege against self-incrimination; it is not self-executing; rather, it must be claimed. [(*Minnesota v. Murphy*, at pp. 427-428; *People v. Miller*, at p. 1315.)]  Thus, unless Brown specially invokes the privilege, shows he faces a realistic threat of self-incrimination and nevertheless is made to answer the question or questions, no violation of his privilege against self-incrimination is suffered.  [(*Miller*, at p. 1315; *Minnesota v. Murphy*, at p. 427.)]  Of course, if the state puts questions to a probationer that call for answers that would incriminate him or her in a pending or later criminal proceeding, and expressly or by implication asserts that invocation of the privilege would lead to revocation of probation, the answers would be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution. [(*Minnesota v. Murphy*, at p. 435; *New Jersey v. Portash* (1979) 440 U.S. 450, 458-459.)] On the other hand, if the questions put to the probationer are relevant to his probationary status and pose no realistic threat of incrimination in a separate criminal proceeding, the Fifth Amendment privilege would not be available and the probationer would be required to answer those questions truthfully.  [(*Minnesota v. Murphy*, at p. 435, fn. 7.)]"  (*Brown,* at p. 320.)

Here, the polygraph condition is not impermissibly overbroad; it is tailored to comport with the court's purpose in imposing the condition.  The condition limits "[p]olygraph questions . . . to items which are relevant to the crime(s) for which

16

[Revoredo] was convicted and [which] assist with supervision, treatment, and rehabilitative efforts."

However, questions that assist with supervision, treatment, and rehabilitative efforts may also incriminate Revoredo in a pending or later criminal proceeding. (*Brown v. Superior Court, supra,* 101 Cal.App.4th at p. 320.) The polygraph condition here thus has the potential of contravening Revoredo's Fifth Amendment privilege against self incrimination. Unlike the situation in *Brown,* at page 313, the condition here is accompanied by a statutory "[w]aiver of any privilege against self-incrimination" (§ 1203.067, subd. (b)(3)). Thus, "if the state puts questions to [Revoredo] that call for answers that would incriminate him in a pending or later criminal proceeding" (*Brown,* at p. 320), he will be unable to invoke the privilege and by refusing to answer will risk violating the terms of his probation, having his probation revoked and being incarcerated. Therefore, "the answers would be deemed compelled under the Fifth Amendment." (*Ibid.*) "A defendant does not lose [Fifth Amendment] protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." (*Minnesota v. Murphy*, *supra*, 465 U.S. at p. 426.) We modify the judgment by striking the probation polygraph condition (condition 10h).

## DISPOSITION

The judgment is modified by striking the probation polygraph condition (condition 10h). As so modified, the judgment is affirmed.

17

                                                                    McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.