Filed 5/20/21  P. v. Kruppe CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARY NOEL KRUPPE,<br><br>    Defendant and Appellant. | B305713<br><br>(Los Angeles County<br>Super. Ct. No. MA075130-01) |

APPEAL from an order of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge. Affirmed.

Michael Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Mary Noel Kruppe drove her car while under the influence of alcohol, exceeded the speed limit, crossed over the center line, and collided with another vehicle in a head-on collision, killing the other driver. Kruppe was convicted of second degree murder and gross vehicular manslaughter. She appeals the murder conviction, arguing the evidence was insufficient to establish the requisite mental state of implied malice. We disagree and affirm.

## PROCEDURAL BACKGROUND

Defendant was charged by amended information with one count of murder (Pen. Code, § 187) and one count of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)).[1] Defendant pleaded not guilty and proceeded to jury trial. The jury found defendant guilty as charged.[2] Defendant was sentenced to 15 years to life in prison for the murder, with a 10-year term on the manslaughter stayed under section 654. Defendant filed a timely notice of appeal.

## FACTS

### 1. The Accident

The fatal collision occurred at approximately 7:00 p.m. on November 15, 2018. Little is known of defendant's activities

---

[1] All further undesignated statutory references are to the Penal Code.

[2] The jury's deliberation was brief. The jury retired to commence deliberations at 2:23 p.m. At 4:18 p.m., the court went back on the record. It had received a question from the jury and conferred with counsel on the response. While putting the planned response on the record, the court received a buzz that the jury had reached its verdict, without having received the answer to its question.

leading up to the accident. Defendant is an elementary school principal. On the day of the accident, defendant attended a school district meeting which ended at 2:30 p.m. There is no evidence as to where she went or what she did between the end of the meeting and 7:00 p.m.

That defendant drank alcohol during this time was not disputed. To the contrary, the parties stipulated at trial that her blood alcohol concentration, when tested two hours after the collision, was 0.19, more than twice the legal limit. A criminalist testified that defendant's blood alcohol concentration at the time of the collision was between 0.19 and 0.23. Given defendant's height and weight, a level of 0.19 correlates to 4.3 drinks in her system.

The collision occurred on a two-lane road with one lane in each direction and a broken yellow line in the center.[3] The speed limit was 55 m.p.h. Defendant was driving southbound; the

---

[3] An officer testified that a broken yellow line allows motorists to cross the line to pass other traffic, taking in consideration the speed limit and oncoming traffic. "[T]he easy way of saying it, is you have to drive on the right side of the road. The[] only intended actions you can do is to legally use it for passing on a broken yellow. And then at any other time you have to drive on the right side of the road." He further explained, "Legally pass means that if you're going to pass, you have to take into consideration the speed limit. So you come up on a slower vehicle which is going under the speed limit, as long as there's no oncoming traffic and you're not going to interfere with its operation – another vehicle's operation, you can legally go over that line, pass that vehicle, then immediately move back over into the correct lane of travel." There was no evidence that defendant was in fact trying to pass another vehicle when she drove into the northbound lane.

victim, Jessica Ordaz, was going north.  Defendant drove her Jeep into the northbound lane, causing a head-on collision with Ordaz's small car.  Defendant's Jeep overrode Ordaz's car, flipped and came to rest on its side.

The airbag control module of defendant's vehicle recorded data from defendant's driving immediately preceding the collision.  This data revealed the following:  In the five seconds leading up to the crash, defendant's Jeep was driving at 68 to 69 m.p.h, 13 to 14 m.p.h. over the speed limit.  She did not slow or apply the brakes during this time.  During the entirety of the five seconds, defendant was steering to the left, to a slight degree; the officer described it as "a slight constant left of steering input throughout the whole recording period."  Defendant did not correct the wheel straight or to the right during this time.

Ordaz had been on a mobile phone call (using her Bluetooth device) with her boyfriend.  The accident happened suddenly.  Mid-conversation, Ordaz gasped, and the call disconnected.

Ordaz died at the scene due to multiple traumatic injuries, including a crushed chest and head injuries.  Defendant was taken to the hospital.

**2.**	***Defendant Denies Drinking***

California Highway Patrol Officer Adrian Ayon interviewed defendant at the hospital emergency room, approximately an hour after the accident.

Defendant admitted driving the Jeep.  She claimed she had not had anything to drink.  Officer Ayon used a breath device to perform a Preliminary Alcohol Screening Test on defendant.  He directed defendant to take a deep breath and blow continuously into the device's tube.  Defendant blew for two seconds and stopped.  Officer Ayon told her that she needed to continue

4

blowing.  When defendant said that she could not, Officer Ayon used a feature on the device to manually trap defendant's breath. Performing the test three times, he obtained preliminary blood alcohol concentrations of 0.175, 0.156 and 0.152.  Officer Ayon arrested defendant.  At 8:58 p.m., almost two hours after the collision, a blood draw was performed for a blood alcohol test; this resulted in the 0.19 reading noted above.

**3.** ***Defendant's Knowledge of the Dangers of Drinking and Driving***

As we shall discuss, the key issue on this appeal is defendant's mental state at the time of the accident – specifically with respect to her subjective knowledge that she was engaging in behavior that endangered the life of others.  (*People v. Watson* (1981) 30 Cal.3d 290, 296-297, 300 (*Watson*).)

No evidence indicated that defendant had taken part in, for example, any drinking and driving safety classes which specifically discussed the hazards of driving while intoxicated. (See, e.g., *People v. Munoz* (2019) 31 Cal.App.5th 143, 168.) However, the prosecution elicited testimony which confirmed that defendant possessed the common knowledge that driving drunk can result in injury or death.[4]

Specifically, as a school principal, defendant was the coordinator of the school's "Red Ribbon Week," during which the children were educated about the risks of drugs and alcohol.  One

---

[4]     The Supreme Court in *Watson* held, "It also may be presumed that defendant was aware of the hazards of driving while intoxicated."  (*Watson, supra,* 30 Cal.3d, at p. 300.) Common sense tells us that the force of this uncontrovertable proposition has grown exponentially in the 40 years since *Watson* was filed.

teacher specifically testified that there was "talk about the dangers of driving while drinking."

### 4. Defendant's Practice of Driving After Consuming Alcohol

Another teacher at the school, Ann Fife, was friends with defendant. Fife and defendant had dinner out five or more times; they would drink alcohol when they went out, although never to excess. Fife described defendant as being "under the influence of alcohol," during their dinners but by that she meant that defendant had consumed one or more alcoholic drinks. Sometimes defendant had only one. Defendant and Fife's drinking never reached the point of stumbling, slurring their speech, or "getting hammered." When they would go out, Fife would leave her car at home and take an Uber. She used this mode of transportation specifically because she did not want to drink and drive. Defendant, however, typically drove herself to the restaurant and would drive home after drinking. On at least one occasion and "probably" more, Fife suggested that defendant take an Uber home when they had plans to go out and drink. Defendant declined, explaining, "You know where I live. It's like $30." Defendant continued to drive her own car home after drinking.

### DISCUSSION

### 1. Standard of Review

" 'In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to

determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value— supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]"[5] (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.)

## 2.    *Law of "*Watson*" Murder*

In *Watson*, the California Supreme Court rejected the argument that a death caused by driving while intoxicated could be prosecuted only as vehicular manslaughter. The court concluded that the crime could also be charged as murder if the facts supported a finding of implied malice. (*Watson, supra*, 30 Cal.3d at p. 294.) The court explained that implied malice occurs "when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. [Citations.]" (*Id.* at p. 296.) This implies a "subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence. [Citations.]" (*Ibid.*) A finding of implied malice depends on a determination "that the defendant

---

[5]    In her opening brief, defendant notes that cases have affirmed convictions when there is "truly overwhelming evidence" of intent. To the extent defendant is suggesting the standard on appeal requires overwhelming evidence, we disagree.

7

*actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*Id.* at pp. 296-297.) The mental state for implied-malice second degree murder "requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143 [issue arose in a non-vehicular case].)

A number of cases have upheld convictions for so-called *Watson* murder against challenges for sufficiency of the evidence.[6] *Watson* did not expressly set forth a test for analyzing

---

[6]     *Watson* itself was a preconviction appeal after a preliminary hearing. The trial court granted a pretrial motion to set aside the murder counts (§ 995), and the prosecution appealed. (*Watson, supra,* 30 Cal.3d at p. 294.) The Supreme Court concluded that the evidence at the preliminary hearing was sufficient to support the charges of murder. (*Id.* at p. 300.) The court added, however, "We do not suggest that the foregoing facts conclusively demonstrate implied malice, or that the evidence necessarily is sufficient to convict defendant of second degree murder. On the contrary, it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction. Moreover, we neither contemplate nor encourage the routine charging of second degree murder in vehicular homicide cases. We merely determine that the evidence before us is sufficient to uphold the second degree murder counts in the information, and to permit the prosecution to prove, if it can, the elements of second degree murder." (*Id.* at p. 301.) Defendant interprets this language as a Supreme Court holding that the evidence in *Watson* was "not enough for the Court to state that implied malice clearly existed." We do not infer from the Court's opinion that the evidence was borderline insufficient; we instead infer simply a caution that the Court was not prejudging a matter following a preliminary hearing and not yet tried under the applicable burden of proof.

8

the sufficiency of the evidence of implied malice. Indeed, the opinion has been read as "deliberately declining to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." (*People v. Olivas* (1985) 172 Cal.App.3d 984, 989 (*Olivas*) [affirming conviction for second degree murder while driving under the influence of PCP].) In this void, appellate courts have collected cases which have affirmed *Watson* murder convictions, and identified factors which have been significant to their conclusions. Specifically, "courts have identified factors relevant for upholding a murder conviction based on drunk driving: '(1) a blood alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' [Citation.]" (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1114 (*Batchelor*), disapproved on other grounds in *People v. Hicks* (2017) 4 Cal.5th 203, 214, fn. 3.) But, while all of those factors were present in *Watson*, " 'nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder.' " (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 (*Wolfe*).) In short, these factors are useful for analysis, but the determination of implied malice is to be decided in light of all circumstances. (*People v. Moore* (2010) 187 Cal.App.4th 937, 942.)

**3. *There Is Sufficient Evidence of Implied Malice***

On appeal, defendant's sufficiency of the evidence argument focuses on the subjective element of implied malice. Specifically, she argues that there is insufficient evidence – particularly when reviewed in terms of the four factors itemized above – that she had the *subjective* knowledge that she engaged

in conduct that was dangerous to human life.  We consider the four factors, then review the totality of the circumstances.

A.  *Factor 1:  A Blood Alcohol Level Above Legal Limit*

The first factor is a blood alcohol level above the 0.08 legal limit.  Defendant concedes that there was evidence of this factor.  We observe the evidence was not simply that defendant's blood alcohol concentration exceeded the legal limit: at the time of the accident it was between 0.19 and 0.23 – or from two-and-a-half to three times the legal limit.  Defendant was not someone who had a drink or two and marginally exceeded the legal limit; the undisputed expert testimony was that defendant consumed in excess of four drinks and was well over the legal limit.

B.  *Factor 2:  A Predrinking Intent to Drive*

There is no direct evidence that defendant possessed a predrinking intent to drive on the day of the collision.  This is largely due to the absence of evidence of defendant's conduct in the hours leading up to the accident.  There is circumstantial evidence of a predrinking intent to drive – defendant had *previously* demonstrated that very intent, and had declined opportunities to change her mindset.  She drove her own car to dinners with Fife, planning to drive home, knowing that she would drink.  Even after Fife suggested that defendant call an Uber to take her home, defendant demurred, citing the cost.  Her practice of often driving after drinking allowed a jury to conclude that her intent was the same on the day of the crash.

C.  *Factor 3:  Knowledge of the Hazards of Driving While Intoxicated*

Defendant makes much of the fact that, although Fife suggested she take an Uber when they drink, she did not *specifically* alert defendant to the risk that defendant could kill

10

someone if she drove drunk. Similarly, while one of the teachers talked about the dangers of drinking and driving as part of Red Ribbon Week, defendant notes that this was not part of the established program and there is no evidence that she was aware of this in her role as high-level coordinator of the program. From this, she argues there is insufficient evidence that she was aware of the specific risk of *death* from driving while intoxicated.

Preliminarily, this factor is described in caselaw as "knowledge of the hazards of driving while intoxicated," (*Batchelor, supra,* 229 Cal.App.4th at p. 1114) not "knowledge of the risk of killing someone while driving while intoxicated." Although *implied malice* only exists when a person has a subjective knowledge of the risk of death, none of the *Watson* factors alone requires that appreciation. The "knowledge of the hazards of driving while intoxicated" is but one factor for the jury to consider in determining whether defendant was aware of the risk of death. (See *Moore, supra,* 187 Cal.App.4th at p. 943 [defendant's prior DUI conviction was relevant "regardless of the content of any class he was ordered to attend. The jury could reasonably conclude that his prior conviction put him on notice of the consequences of driving with extreme recklessness."].)

Turning to the evidence, we conclude that the jury could have reasonably inferred that defendant did, in fact, possess the common knowledge of the hazards of driving while intoxicated. Defendant's coordination of the elementary school's participation in Red Ribbon Week meant she had general awareness of the risks presented by drugs and alcohol; educating the students about these risks was the entire purpose of the program. The most reasonable inference from Fife's suggestion to defendant that she take an Uber after they had been drinking after dinner

11

was that she was alerting defendant to the dangers of drinking. Additionally, when defendant was questioned after the accident, she lied about drinking and tried to defeat the Preliminary Alcohol Screening Test by blowing inadequate breaths – demonstrating that she well knew that she should not, in fact, have been driving drunk.

###### D. *Factor Four: Highly Dangerous Driving*

Defendant engaged in highly dangerous driving, as the recorded data from her vehicle demonstrates. For the five seconds prior to the collision, she was steering to the left, into oncoming traffic, at a speed 13 to 14 m.p.h. over the legal limit. On appeal, defendant suggests that her driving was not highly dangerous because the evidence showed that she "turned in a manner that is consistent with an attempt to overtake and pass a vehicle in her lane," and that "the road was marked to allow this kind of maneuver." First of all, there was no evidence that defendant was attempting to pass, or that there even was a vehicle ahead of her in her lane. As her counsel described it in closing argument to the jury, "all we have is she apparently drifted over and had the accident."[7] In any event, the road was marked to allow *safe* passing – only if it could be done without exceeding the speed limit and without interfering with opposing traffic.

In *Wolfe*, the defendant, while driving intoxicated, "failed to negotiate a curve" and veered into a bike lane, killing a pedestrian. (*Wolfe, supra,* 20 Cal.App.5th at p. 679.) In response

---

[7] We observe that the evidence showed at least *five seconds* of gently steering to the left – not a move into the opposing lane followed by a correction to straight, as one would expect if defendant were attempting to pass another vehicle.

to Wolfe's appellate argument that there was no evidence of highly dangerous driving, the Court of Appeal responded, "[A]t a minimum, the evidence reasonably showed that Wolfe was unable to keep her vehicle within her designated traffic lane due to her intoxication. A jury could reasonably conclude that this inability to stay in a lane does, in fact, qualify as 'highly dangerous' driving, particularly given the dangerous consequences, as unfortunately demonstrated by [the pedestrian's] death." (*Id.* at p. 684.) The same is true here. The jury could reasonably have concluded that defendant's inability to keep her vehicle in her designated traffic lane, at the time she was exceeding the speed limit, does, in fact, qualify as highly dangerous, particularly given the resulting head-on collision.

E.     *Totality of the Circumstances*

While we conclude there was some evidence of all four of the factors identified in the case law, we emphasize that *Watson* does not condition an appellate affirmance on a jury finding that each factor was present or present in any particular combination. Our test is limited to whether, under the totality of the circumstances, the jury could have concluded defendant possessed the requisite mental state – specifically, that she possessed a subjective awareness that her conduct endangered the life of another.

This is a close case. In many appeals affirming *Watson* murder convictions, there is overwhelming evidence of the defendant's conduct leading up to a collision that clearly demonstrates subjective awareness – such as evidence that the defendant recklessly drove impaired for some time prior the accident. (E.g., *Olivas, supra,* 172 Cal.App.3d at pp. 986, 988 [the defendant led police on a high-speed chase covering nearly two

13

miles, during which he ran four stop signs and three red lights, hit a stopped car, and narrowly missed colliding with two others – all of which was sufficient to apprise him of the risk he was creating].) In others, a drunk defendant was told by others that he was too impaired to drive, the defendant responded aggressively and drove anyway. (See *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1076-1078 [multiple people advised the defendant not to drive and even took his keys from him; the defendant took them back by threatening force].) Here, we have no evidence of defendant's conduct between the end of the district meeting and the five seconds prior to the accident – although her very high blood alcohol level establishes that she had quite a few drinks during this time.

Our task is not comparative. Even if the conduct here was less dangerous than the cases we have cited – a point we do not make – what matters is the evidence is legally sufficient. If we were to undertake a comparison, the present facts are most similar to those of *Batchelor*. There, Batchelor, who was driving with a blood alcohol concentration between 0.13 and 0.24 – there were contrasting expert opinions –, drove toward a sharp curve at high speed. The curve had a posted speed limit of 40 m.p.h.; Batchelor's speed was between 50 and 57 m.p.h. Unable to negotiate the curve, the car struck a traffic island and crashed into a tree, killing his passenger. Batchelor never stepped on the brakes. (*Batchelor, supra,* 229 Cal.App.4th at pp. 1105-1107.) Although Batchelor had suffered a previous conviction for driving under the influence and completed a first offender drinking program, he testified that nobody ever told him that a possible consequence of drinking and driving was killing someone. (*Id.* at p. 1107.) The blood alcohol concentration, speed in excess of the

14

limit, and failure to employ his brakes to slow the car when a collision was imminent are all nearly identical to this case. While defendant, unlike Batchelor, did not have a prior conviction or participation in a first offender driving program, she had actually coordinated a program to educate children on the dangers of drugs and alcohol. And, defendant's friend had repeatedly reminded her of the option of taking an Uber when she was drinking. The evidence was held sufficient in *Batchelor*. It is likewise sufficient here.

### DISPOSITION

The judgment is affirmed.


RUBIN, P. J.

WE CONCUR:


BAKER, J.


MOOR, J.

15