Filed 5/25/23  P. v. Smith CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TANIEA SMITH,<br><br>Defendant and Appellant. | B316407<br><br>(Los Angeles County<br>Super. Ct. No. SA098098) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lauren Weis Birnstein, Judge.  Affirmed.

Stanley V. Granville, under the appointment by the Court of Appeal, for Plaintiff and Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Taniea Smith offered to hold her friend and neighbor's electronic apartment key for safekeeping during a party. Then, while her friend remained at the party, defendant entered her friend's apartment and stole multiple pairs of designer shoes and other accessories. Defendant was convicted of a single count of first degree burglary (Pen. Code, § 459). On appeal, she raises discovery issues, challenges the sufficiency of the evidence, and claims prosecutorial misconduct. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Apartment Complex

Defendant and the victim, Chloe Kahan, lived next door to each other in apartments in a complex called Villas at Playa Vista, which is owned by the Irvine Company. Their units were in the "Sausalito Villa," and, in fact, next door to each other in the same building. They were on the second floor of apartments, above a first floor of apartments, which sat above a garage.[1]

Access to the apartments is controlled by electronic key fobs – both for the common areas and specific apartments. Each apartment comes with two unique key fobs. Inside the system, the fobs are labeled "Resident 1" and "Resident 2." Whenever a key fob is used to open a unit, it leaves an electronic time stamp in the lock itself. Irvine Company employees could pull an "audit log" from the lock – via a handheld device they had to physically bring to the lock – to learn which fobs accessed the lock at which times. If someone other than a resident – such as an Irvine Company maintenance person – needed to access a resident's

---

[1] There is an elevator that can be taken from the garage level. Pedestrians could also bypass the garage level, by means of outdoor stairs.

2

unit, that person's key fob would be programmed for access to the unit. It would therefore show in the lock audit as that person's fob, not a resident's fob. Because the locks were not networked, the time of day varied from lock to lock, and would not necessarily accurately reflect the actual time of day.

The burglary in this case occurred while Kahan was hosting a birthday party for herself. She had the event in the party room of a different villa, the "Malibu Villa," which was located about a five minute walk, or one-and-a-half to two minute drive, from Sausalito Villa.

There are numerous security cameras in the complex, including in the elevators, in the garage elevator lobby, and in the Malibu party room.

## 2.    *Defendant and Kahan's Friendship*

Kahan met defendant a couple years before the burglary, when defendant moved into the apartment next door. They had common interests, especially fashion, and became close friends. They would talk nearly every day, and visited each other's apartment.

Kahan's apartment had a bedroom and a den. Other than one corner devoted to a workspace, Kahan's den was a storage space for her bags, shoes, and accessories. Shoeboxes were stacked higher than her head, in what was described both as a "wall of shoes," and "organized chaos." Many of the shoes were designer shoes, costing as much as a $1000 per pair. She had over ten pairs of Louboutins, which were valued over $500 each. She also kept more than ten designer purses in her den. She kept some jewelry in her den, and other jewelry in her bedroom, in a jewelry box made to look like a book. This included custom

3

diamond and gemstone pieces valued in the tens of thousands of dollars.

Defendant also had an impressive collection of designer shoes and accessories, kept in her own apartment. Kahan and defendant had talked about the possibility of sharing each other's shoes, but they could not, because they were not the same size. Kahan wore a 37.5 (in European sizes) while defendant wore a 36.

### 3.    *Kahan's Party and the Burglary*

On the evening of February 24, 2018, Kahan threw herself a birthday party in the Malibu Villa party room. The party was scheduled from 7:00-10:00 p.m., although it ran over.

Kahan kept both key fobs for her apartment on a pink lanyard. She lived alone and generally kept both fobs with her at all times.

During the party, defendant offered to look after Kahan's keys, so that Kahan would not have to worry about them. At around 9:15, defendant gave Kahan her lanyard with both key fobs on it. She trusted defendant and thought defendant was being helpful.

Shortly thereafter, defendant left the party. The cameras in the Malibu Villa party room would show defendant was gone for 35 minutes between 9:36 and 10:11, according to the time stamps on the video.[2] During her absence, defendant went back

---

[2]    Although there were four cameras in the Malibu party room, all of the relevant video clips are from the same camera. Thus, while the actual times of defendant's departure and return may be subject to debate, the amount of time that passed between these events is not. Specifically, the video clips show: (1) at 9:16, Kahan gave defendant her lanyard with the key fobs;

to the Sausalito Villa building, and burglarized Kahan's apartment – using Kahan's own key fob to enter her unit, and bringing stolen items back to her own apartment. Key fob logs would show this back-and-forth occurred twice during the 35-minute window.[3]

Defendant did not directly return the lanyard to Kahan, but gave it to a friend of Kahan's, who later gave it to Kahan. When defendant returned the lanyard, it was missing one of Kahan's key fobs, which defendant apparently gave to an unidentified accomplice, who used it to enter Kahan's apartment again that night, after defendant had returned to the party.

When Kahan went home after the party, she discovered that her lanyard had only a single key fob on it, "Resident 2." She assumed the other one had fallen off, and, seeing nothing amiss in her apartment, was unconcerned. The next morning, she called the leasing office and told them she had lost a key fob and needed it deactivated. It was not deactivated at this time.

---

(2) at 9:17, defendant picked up her coat and left; (3) at 9:28, defendant returned for her purse; (4) at 9:36, defendant left again; (5) at 10:11, defendant returned, having changed her shoes into flats; and (6) at 10:12, defendant handed the lanyard to a seated woman. In short, defendant was gone, with Kahan's key fobs, from 9:36 to 10:11, a period of 35 minutes.

[3] The key fob logs on the two apartments are not synchronized to each other, real time, or the Malibu Villa party room, and it is likely the times are not precisely accurate. They show four entries to Kahan's door in a 31-minute period (9:32, 9:37, 10:01 and 10:03); and two entries to defendant's apartment within a similar time period, 27 minutes apart (9:49 and 10:16).

### 4. *Possible Second Burglary*

On February 27 – a few days after the party – defendant called Kahan; she was upset and needed to talk. Kahan was on her way out and could not talk, but told defendant she would let her know when she got home. The key fob logs reveal additional entries into Kahan's apartment with her missing "Resident 1" key fob during the time she had told defendant she would be away.

### 5. *Kahan's Discovery of the Burglary*

On March 1, Kahan wanted to use her Celine Phantom purse, and discovered it was not where it should have been. She searched the entire apartment and concluded it was missing. She then searched for a particular Louis Vuitton purse and could not find it either. At this point, she realized she had been burglarized, and called the police.

Kahan also called defendant, thinking that defendant might also be in harm's way. Defendant, at this point, insinuated herself into the investigation, accompanying Kahan when she first met with Irvine Company representatives and the police.

### 6. *The Initial Investigation*

Jay Vela is Irvine Company's Service Manager for the Sausalito Villa. He arranged a meeting for Kahan with, among others, Joseph Alvarez, the head of security. Kahan was very upset at the meeting, yelling at everyone. She suspected the Irvine Company – possibly maintenance employees – of stealing her belongings. Defendant was agreeing with everything Kahan said. Alvarez first thought the two women were roommates; when he learned defendant was just a friend of Kahan's, he asked her to leave.

6

Alvarez had suggested that Vela run a lock audit to see who had been in Kahan's apartment. Vela ran it that day. It did not show any entries from maintenance or other Irvine Company employees; but it did reveal the February 24th and 27th entries with the "Resident 1" key fob Kahan had thought she lost at the party.

Alvarez decided to watch the videos recorded from the cameras in the Malibu Villa party room for the entirety of the party, to see if he could track Kahan's pink lanyard with the key fobs on it. This was a lengthy process as there were multiple cameras, and it would take him days to complete.

On March 1, the same day as Kahan's initial meeting with Alvarez, she and defendant also met with Los Angeles Police Department officers. During their meeting, defendant told police that a number of people had held Kahan's keys during the party. She volunteered, "Like, at one point, I had her keys, but I was stationed in the place." She said she had Kahan's keys so that she could let people in.

7.      *Alvarez's Review of the Videos Points to Defendant*

In his search of the videos from the party, Alvarez saw Kahan pass her lanyard to defendant, and defendant leave the party. He saw her return, wearing different shoes, and pass the lanyard to an unidentified woman in a chair. Finally, Alvarez saw the seated woman return the lanyard to Kahan, without handing it to anyone else or leaving the room in between.

7

At this point, Alvarez checked against videos from the Sausalito Villa elevator lobby (on the garage level) and inside the elevator itself.[4] He spotted defendant there.

In the first pair of videos, defendant enters the elevator lobby from the garage, purse (and jacket) in one hand, and Kahan's pink lanyard swinging in the other. She puts on her jacket, shoves the lanyard into the coat pocket, and takes the elevator up to the third floor. In the second pair of videos, showing events 31 minutes later, defendant enters the elevator lobby from a different entrance. She has changed her shoes and is now wearing flats. She appears to be texting on her phone, walks off camera for about 15 seconds, returns, and goes back to the elevator and up to the third floor again. Before she gets off the elevator, she reaches into her purse and appears to take out a lone key fob, unattached to a key ring. Alvarez testified that he had watched the intervening elevator footage, and saw nothing else depicting defendant, Kahan, or the pink lanyard.

At that point, Alvarez suspected defendant. He requested a key lock audit of her apartment. He discovered the entries into defendant's apartment after the suspicious entries into Kahan's. He shared his findings with the Irvine Company, and ultimately turned over the video clips, the lock audits, and his notes to the investigating officer, Detective Rebecca McIntire.

---

[4] The timestamps in these videos are approximately seven minutes off from each other. That is to say, defendant can be seen entering the elevator and pressing a button in videos taken from both cameras. From the elevator lobby camera, she hits the button at approximately 9:42:46, but from the elevator interior camera, she hits it at 9:49:53. It is unknown whether either of them are accurate to real time.

## 8.  *The Search*

Detective McIntire did not simply accept the results of Alvarez's investigation; she conducted her own.  Nonetheless, she suspected defendant.  The videos proved that defendant had lied to police when she told them she had held Kahan's keys but "was stationed in the place."  After reviewing all of the evidence, Detective McIntire came to the belief that defendant had entered Kahan's apartment.

As the investigation was progressing, Kahan determined more and more of her belongings had been stolen.  In addition to the two purses she initially discovered missing, there were also multiple pairs of designer shoes, additional bags, and about a dozen pieces of jewelry.

The friendship between defendant and Kahan soured.  Detective McIntire had not wanted Kahan to arouse defendant's suspicions for fear defendant would try to get rid of the stolen property, but defendant had become aware that her conduct was being investigated.

On May 8, 2018, a search warrant was executed at defendant's apartment and in her car.  Alvarez accompanied the police search team, as an observer.  Police found two of Kahan's purses in defendant's apartment.  They also found five pairs of Kahan's Louboutin shoes in defendant's trunk.[5]

---

[5]    The police took digital photographs of all of the evidence they recovered during the search.  Detective McIntire testified that the memory card with the photos was lost.  However, Alvarez had also taken photographs of the shoes in defendant's trunk.

9

## 9. *Defendant's Interview*

Defendant was taken to the station, Mirandized, and interviewed by police. Almost immediately, defendant volunteered that there is a lot of "history" between her and Kahan, and that she (defendant) "paid for a lot of things when it came to" Kahan. While she never expressly stated that she had engaged in self-help to compensate herself, she claimed that Kahan "use[s]" people, and rattled off a litany of expenses she had paid for Kahan, as though this was somehow exculpatory.

Defendant denied using Kahan's key fob to enter her apartment. She said the seized bags were her own, but the interview ended up focusing on the shoes.[6] When specifically asked about the shoes found in her car, defendant first said the shoes were hers. Later, she suggested she was being set up by Kahan. When told one of the pairs was turquoise in color, she said she did not own shoes in that color. Eventually, she said, "Then more than likely if they are in my car they not belong to me. I don't keep shoes in my car like that." Finally, she pleaded, "If they're hers, give them back to her."

Police did, in fact, return the shoes, and the two bags, to Kahan. During defendant's interview, police repeatedly advised her that if she had receipts for the shoes, she could help her case by supplying them to the police. She never did.

---

[6] At one point, one of the detectives questioning defendant, Detective Salazar, said that maybe the bags were defendant's and maybe they were Kahan's, but the shoes undeniably belonged to Kahan.

10

**10.** *The Charges*

On March 25, 2019, defendant was charged by information with two counts of burglary – related to February 24 and February 28. She entered a plea of not guilty.

**11.** *Defendant's Motions to Compel Discovery*

Alvarez had given Detective McIntire only the relevant video clips he found, not the entirety of the party surveillance video from the four cameras in the Malibu room.

At the March 11, 2019 preliminary hearing, in cross-examination by defense counsel, Alvarez said, "All footage was turned over. It was transferred to a flash drive." Counsel, at this point, believing there had been two cameras in the room (rather than four), asked if Alvarez had turned over footage from both cameras for the entirety of the party. Alvarez responded, "I don't believe so." The following colloquy occurred:

> "Q: Okay. So if there is still footage out there you still have it though, correct?
> "A: Negative.
> "Q: What happened to that footage?
> "THE COURT: Counsel?
> "Defense Counsel: Okay. Thank you."

On August 19, 2019, defendant moved to compel discovery from the prosecution, seeking the entirety of the footage. Defendant relied on Alvarez's preliminary hearing testimony that he had turned over all of the footage, overlooking Alvarez's subsequent statement that he did not believe he had. Defendant asked that the court "order the prosecution to turn over the full, unedited version of the surveillance footage, in the same condition that it was initially turned over."

At the hearing on the motion, the court asked Detective McIntire if she had the full surveillance and added, "if you do, the court is ordering you to turn it over to the defense." The detective replied she had turned over every video she had, but agreed to check again. The court added that defense counsel had his own investigator who had access to Alvarez and could ask him what he did or did not provide to the detective.

Defendant then filed a motion in limine, asking to hold a foundational hearing on whether the Malibu room footage was provided to Detective McIntire in clips or "in one giant chunk." This was followed by a second motion to compel discovery, which sought, "[f]ull, un-edited, unclipped, video surveillance footage from 02/24/2018 and 02/27/2018, or, in the alternative, the original flash drive provided to Law Enforcement by Joseph Alvarez containing the surveillance footage as it was provided on the date it came into possession of law enforcement." (Emphasis omitted.) Finally, at an April 23, 2021 hearing, defense counsel represented that he had spoken with the prosecutor, who had spoken to the detective, and counsel was satisfied that "there's nothing more that . . . the prosecuting team can do to get the discovery that is – either no longer exists or is outstanding because it's – they don't have access to it or it just no longer exists."[7]

---

[7] In her opening brief on appeal, defendant states that the prosecution was ordered to turn over the requested discovery but "never fully complied." To the contrary, the record indicates defense counsel conceded the prosecution satisfied its obligation.

**12.** *The Trial*

The matter proceeded to jury trial. The prosecution introduced defendant's statement to police about having Kahan's keys but being stationed in place; the video clips that undermined that statement; the key logs showing unauthorized entries into Kahan's unit; the results of the search; and Kahan's detailed testimony, supported by photographs and receipts, demonstrating ownership of the seized shoes and bags.

Defendant called no witnesses and offered no evidence of her ownership of the seized items.

**13.** *The Verdict, Sentence, and Appeal*

The jury found defendant guilty of the February 24 count of first degree burglary, and not guilty of the February 27 count. The trial court suspended imposition of sentence and ordered defendant to complete two years of formal probation with 25 actual days in jail and 60 days of community labor. She was to pay restitution in an amount to be determined. She filed a timely notice of appeal.

## *DISCUSSION*

On appeal, defendant argues: (1) she was denied due process by the failure of the prosecution to turn over the complete videos in the possession of the Irvine Company; (2) she was denied due process by the prosecution having allowed the Irvine Company to destroy the exculpatory evidence of the remaining videos; (3) the evidence was insufficient to support the verdict; and (4) the prosecutor committed misconduct in argument to the jury.

13

1.    ***The Prosecution Had No Duty to Turn Over Video It Never Possessed***

Defendant first contends that the missing video evidence was exculpatory and that, therefore, the prosecution's failure to turn it over violated its obligations under *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*). *Brady* provides, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.* at p. 87.)

When a *Brady* claim is based on the failure to disclose evidence the defendant knew about at trial, the defendant's "failure to make proper objections, request appropriate sanctions, or seek any continuance on the matter is fatal to his contentions on appeal." (*People v. Morrison* (2004) 34 Cal.4th 698, 714.) Here, once defense counsel was satisfied Alvarez had never given the full video to Detective McIntire, he conceded that the prosecution had satisfied its disclosure obligations.[8] The contention is therefore waived.

In any event, it is meritless. The prosecution has a duty to search for and disclose exculpatory evidence if it is possessed by a person or agency that was used by the prosecutor or investigating agency to assist the prosecution or investigating agency in its work. (*IAR Systems Software, Inc. v. Superior Court* (2017)

---

[8] In her appellate brief, defendant references a motion for sanctions for the failure to turn over evidence. But that motion related to the stolen shoes and purses the police had returned to Kahan, and the loss of the police photographs of those items, not the complete videos Alvarez reviewed. Defendant makes no argument on appeal regarding the court's ruling on her motion for sanctions.

12 Cal.App.5th 503, 514 (*IAR Systems*).) On appeal, defendant argues that "when the [LAPD] enlisted The Irvine Co.'s employees, they became an extension of the investigation and of the LAPD." Case authority provides for a totality of the circumstances inquiry to determine whether "the prosecution has exercised such a degree of control over the nongovernmental actor or witness that the actor or witness's actions should be deemed to be those of the prosecution for purposes of *Brady* compliance." (*IAR Systems,* at pp. 517-518.) Defendant does not attempt this analysis on appeal, nor did she pursue the argument before the trial court. To the contrary, when discussing other evidence in Alvarez's possession (the photographs he had taken of the search), defense counsel conceded that it was "outside the prosecuting team's realm of possession." This was clearly correct; Alvarez conducted his own investigation and shared the results with Detective McIntire; he was not part of the police's inquiry.

**2.      *The Prosecution Had No Duty to Preserve Evidence It Never Possessed***

Defendant next argues that the prosecution violated her due process rights by failing to immediately seize all of the video in the Irvine Company's possession, as the Irvine Company was itself a suspect in the theft.

The duty to retain, rather than to disclose, potentially exculpatory evidence is governed not by *Brady*, but by *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Ariz. v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).

*Trombetta* held that the duty to preserve evidence in police possession applies only if the evidence possesses an exculpatory value that was *apparent* before it was destroyed, and if it is of such a nature that the defendant would be unable to obtain

15

comparable evidence by other reasonably available means. (*Trombetta, supra,* 467 U.S. at pp. 488-489.) *Youngblood* held that if the evidence the police failed to preserve was merely *potentially* exculpatory, there is no denial of due process unless the defendant can establish bad faith on the part of the police. (*Youngblood, supra,* 488 U.S. at p. 58.)

Defendant attempts to fit this case under *Trombetta*, by arguing the missing Malibu room surveillance tapes were apparently exculpatory, as they would establish precisely how incorrect the time stamps were on the inculpatory clips. There is no factual support for this argument. As to the single camera in the Malibu room from which all of the relevant clips were taken, the prosecution established at trial that the camera was less than one minute off.[9] More importantly, the actual time of events in the Malibu room was largely irrelevant; what matters was the correspondence of those events to defendant being back in the Sausalito building with Kahan's key fobs, and the key lock audits. Additional Malibu room video would have made no difference on this point. Indeed, prosecution witnesses admitted at trial than none of the time stamps on any of the videos or lock audits were accurate. Further evidence of inaccuracy did not have apparent exculpatory value.

*Trombetta* therefore does not apply. At best, this is a case of *potentially* exculpatory evidence, bringing this case under

---

[9] At one point in the party, someone used Kahan's phone to take a posed picture of Kahan and defendant. Comparing the time stamp on the photo on Kahan's phone with the time stamp on the Malibu surveillance video of when the photo was taken revealed a discrepancy of about 15 seconds.

16

*Youngblood*, and requiring defendant to establish bad faith. She did not attempt to do so before the trial court, and provides no legal basis for the suggestion that she can raise this inherently factual inquiry for the first time on appeal.[10] In any event, defendant's bad faith argument is based on the premise that the police left the video "in the exclusive hands of a suspect." This, in turn, is based on Kahan's initial belief that perhaps a maintenance person had entered her apartment. But the key lock audits, performed the same day Kahan first contacted police, established that the unauthorized entry was from her own, missing, "Resident 1" key fob, not the fob of an Irvine Company employee.[11] On these facts, defendant cannot establish bad faith.

### 3.    *The Evidence of Guilt is Sufficient*

" 'In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment

---

[10]    We review a trial court's decision on a *Youngblood* motion for substantial evidence. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 744.)

[11]    Moreover, Alvarez, who had possession of the videos, was not an Irvine Company employee. He worked for Allied Universal, a hired vendor for the complex.

17

the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.)

Defendant argues the prosecution's "case was based on the speculation that the defendant was not seen on the [Malibu room] video at the time the apartment door was opened," and relies on the conceded inaccuracy of the time stamps on the surveillance cameras and lock audits.  This is an understatement of the evidence against defendant.  It was not simply that she was absent from the party at the time of the entries into Kahan's apartment.  The evidence established that defendant left the party with Kahan's keys.  With Kahan's lanyard indisputably in her hand, she returned to Sausalito Villa and went up to the third floor.[12]  Unauthorized entries were made with a key fob that defendant had in her pocket.  Five pairs of Kahan's shoes were subsequently discovered in defendant's car.  This evidence justifies the verdict.

4.     ***Defendant's Assertion of Prosecutorial Misconduct Fails***

Finally, defendant claims the prosecutor committed misconduct during argument, by characterizing defendant as a "liar" and "backstabber" who "trampled" Kahan's friendship.  The

---

[12]     In passing on appeal, defendant argues that there is no evidence that she drove, rather than walked, from Malibu Villa to Sausalito Villa, greatly limiting her time to commit the burglary.  We disagree.  The video shows defendant entered the elevator lobby on the garage level from the garage.

prosecutor did, in fact, make those, and similar, statements during argument. Indeed, that defendant betrayed Kahan's trust had been the theme of the prosecutor's opening statement from the beginning of the case. Defendant challenges these statements as improper epithets and attacks on her character.

There are at least two reasons why this argument fails. First, defendant failed to object and request the jury be admonished. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).)

Second, a criminal prosecutor has "much latitude" in closing argument, and may make a "strongly worded and vigorous" argument as long as it "fairly comments on the evidence" or "asks the jury to draw reasonable inferences" from that evidence. (*Seumanu, supra,* 61 Cal.4th at p. 1331.) "The prosecution may properly refer to a defendant as a 'liar' if it is a 'reasonable inference based on the evidence.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 338.) Here, the characterizations were supported by the evidence. Kahan and Detective McIntire both testified to their opinions that defendant had been untruthful.[13]

---

[13] Anticipating that the prosecution would argue defendant waived prosecutorial misconduct by failing to object, defendant suggests that his trial counsel rendered ineffective assistance by not objecting. Although we conclude there was no misconduct, we reject the ineffective assistance argument for a second reason: the existence of a deliberate tactical reason for the failure to object. (*Seumanu, supra,* 61 Cal.4th at p. 1331.) The trial court observed that when Detective McIntire testified that she believed

Detective McIntire also testified that, during her interview with defendant, defendant was "deflecting blame to the victim."  In addition, "trampl[ing]" a friendship is certainly a reasonable characterization of the facts here, where defendant relied on Kahan's trust and friendship to take her keys, only to surreptitiously enter her apartment and steal her belongings.

### DISPOSITION

The judgment is affirmed.

MOOR, J.

WE CONCUR:

RUBIN, P. J.                    KIM, J.

---

defendant was untruthful in the interview, "there was no objection by the defense.  I was waiting for one."  Defense counsel replied, "Your Honor, just quickly, for the record, just generally, the objection wasn't levied because – purposefully.  And I'll just leave it at that just for later on down the road, if it gets to the Court of Appeals."  The trial court stated, "So you had your motivation for not objecting."  Counsel confirmed, "Yes."  In defense counsel's closing argument, he suggested that everyone was calling defendant a liar by focusing on every little inconsistency in her statements, but ignoring the inconsistencies in Kahan's statements.  Counsel appears to have made the tactical decision to allow defendant to be characterized as a liar, so that he could point out the unfairness of the characterization when compared to Kahan's inconsistencies.  This tactical reason for the failure to object to Detective McIntire's testimony applies equally to the failure to object to the prosecutor's argument.