Filed 6/25/25  P. v. Lee CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

---

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| THE PEOPLE, | C099230 |
| Plaintiff and Respondent, | (Super. Ct. No. 21F4780) |
| v. | |
| SUPENSIVE LEE, | |
| Defendant and Appellant. | |

Defendant Supensive Lee was charged with murder after Patrick B.[1] was shot and killed near his apartment.  Defendant's defense at trial was that he was not the shooter, but the jury concluded otherwise and found him guilty of second degree murder and related offenses.  The verdict hinged on the accounts of three eyewitnesses, all relatives of the victim.  The trial court sentenced defendant to a total term of 33 years plus 55 years to life. Defendant appeals, challenging the sufficiency of the evidence to support several of his

---

[1]     To protect their privacy, we refer to the victim and witnesses by their first name and last initial or initials.  (Cal. Rules of Court, rule 8.90(b)(4), (10), (11).)

1

convictions. We conclude that substantial evidence supports the convictions and, therefore, affirm.

BACKGROUND FACTS AND PROCEDURE

On June 25, 2021, Patrick B. was shot and killed at his apartment at Churn Creek Road in Redding. Among others, Patrick B.'s fiancé Mary V., their seven-year-old daughter A.B., and Patrick B.'s nephew B.F., witnessed the shooting.

A.      *Eyewitness Accounts of the Shooting*

Mary V. testified that on the evening of June 25, 2021, Patrick B. was outside the front door of their apartment talking to B.F. when a group of men approached them. The men appeared to be intoxicated and "out of it." Mary V. testified that she knew a few of the men, including "Ling" (later identified as "Cheng"), "Baelee," and "Truck." Mary V. recorded the interaction with her phone from inside her apartment because she felt the men were "getting a little hostile." Her daughter A.B. also recorded the interaction. Both videos were played for the jury.

Sometime later, after Mary V. had stopped recording, Mary V. and A.B. heard people arguing. A.B. looked out the window and saw one of the men in the group—Cheng— preparing to fight Patrick B. Mary V. went outside to try to stop the fight. However, by the time she arrived, Patrick B. and Cheng were fighting.

During the altercation, a person later identified as defendant pulled out a pistol and started shooting at Patrick B. Mary V. testified that when the shooting started, she, A.B., and B.F., ran inside the apartment. Patrick B. was shot as he was running toward the apartment. He collapsed on the living room floor as he entered the apartment. Cheng followed Patrick B. into the apartment and started fighting with Patrick B. on the floor.

Defendant also followed them into the apartment. Defendant stood by the doorway and pointed his pistol at Mary V., B.F., and A.B. while Cheng was fighting with Patrick B. Mary V. was scared and thought she was going to die. Mary V. testified that initially A.B.

2

was standing next to her, and B.F. was hiding behind the couch. At some point, A.B. went to her bedroom. When the men left the apartment, Mary V. called 911.

In court, Mary V. identified defendant as the person who shot her husband. She testified that there was "no doubt" in her mind because she "know[s] his face." She believed she could more easily identify defendant because he (seemingly) shared her race (Asian) and ethnicity (Hmong). She also recognized defendant as someone she had seen around the apartment complex a few times and as one of the men in the cell phone video she recorded. She testified that the men in the video were the same ones who approached Patrick B. and B.F. outside of her apartment. She testified, however, that her in-court identification of defendant was based on her independent recollection, not what she saw in the video.

A.B., who was nine years old at the time of the trial, provided a similar account. She testified that Patrick B. was outside with B.F. when Cheng came over and "put his fist[s] up." Baelee, Truck, and another man whose name she could not remember were also there. A.B. testified that Patrick B. and Cheng began fighting, and then a person pulled out a gun and started shooting. She heard around four or five shots. A.B. recalled that she was in the living room of the apartment, and the shooter was outside when the shooting began. Patrick B., Mary V., and B.F. immediately ran inside the apartment. She testified that Patrick B. was inside the doorway when he was shot. The shooter then followed them inside and pointed his gun at her and the other people. A.B. went to her bedroom after her mom told her to go there.

In court, A.B. identified defendant as the person who shot Patrick B. A.B. recalled that defendant was wearing jean shorts, a blue hat, and no shirt at the time of the shooting.

A.B. was asked about the cell phone videos that she and her mom recorded. A.B. testified that she watched the video she recorded multiple times and that it helped her to remember things. She testified that she "memorized" the people from the video. However, she still would be able to remember the people's faces even if the videos did not exist. A.B.

3

also recalled watching Mary V.'s video, and she recalled listening to Mary V. and B.F. talk about the video while they were at the police station. She did not remember talking with her mom or B.F. about the video. A.B. did not believe that listening to Mary V. and B.F. talk caused her to remember things differently. Mary V. testified that she did not do or say anything to try to influence A.B.'s memory of what happened.

B.F. testified that on the day of the shooting, he and Patrick B. were outside the apartment socializing when they encountered a group of individuals who were consuming alcohol. The tone of the conversation was "somewhat hostile." Patrick B. told the group that although he "respects them and cares for them," he did not appreciate how they acted when they were drinking or doing drugs. Toward the end of the conversation, defendant showed up. At that point, the group wanted B.F. and Patrick B. to have a drink with them. Patrick B. did not drink, so B.F. drank a drink to "clear the air." After that, they "shook hands" and "everything seemed fine."

Sometime later, a bald Asian man with no shirt and the letters "AC" tattooed on his chest—later identified as Cheng—approached B.F. and Patrick B. Cheng was part of a group of "at least" five or six Asian males. Cheng challenged Patrick B. to a one-on-one fight. Patrick B. initially refused, but Cheng continued to antagonize Patrick B. until he started to fight. Patrick B. "dropped" Cheng shortly after the fight began, but Cheng got up and continued fighting. After Patrick B. "dropped" Cheng a second time, B.F. and Mary V. tried to break up the fight. A heavyset man in black and red shorts then pulled B.F. back, saying, "That's not what you want to do. Trust me, you don't want to do that." That is when shots were fired. B.F. testified that the shooter was standing next to him. B.F. identified defendant as the shooter in court.

Once the shooting started, Mary V. and Patrick B. ran inside the apartment. B.F. also ran toward the apartment and pushed A.B. inside. Patrick B. was shot as he made his way through the door. Cheng followed Patrick B. inside and continued fighting with Patrick B. while he was on the ground. B.F. testified that the man in the black and red shorts also

4

entered the apartment and began punching Patrick B., although B.F.'s testimony on this point was inconsistent.[2] The shooter likewise entered the apartment and pointed his gun at B.F. while the attack on Patrick B. continued. B.F. tried to hide behind the couch. B.F. initially testified that A.B. was in her bedroom when the shooter entered the apartment, but later clarified that he saw A.B. inside before she ran down the hallway and into her parents' bedroom. Eventually, the intruders left, and Mary V. called 911.

The cell phone videos recorded by Mary V. and A.B. were played for the jury during B.F.'s testimony. B.F. testified that he watched Mary V.'s video at the hospital after the shooting and recognized the shooter. He testified that the video helped him determine who the shooter was because he "[knew] the face that was in the video was the person next to [him] . . . shooting the gun." Watching the video did not affect his memory of the shooter. In court, B.F. pointed out the shooter in the videos. B.F. identified defendant in court and testified that he had "no doubt" that defendant was the person who shot Patrick B.

B.F. acknowledged that during his conversations with law enforcement, he had given inconsistent descriptions of whether the shooter was wearing jeans or shorts, and whether the shooter was wearing a tank top or was shirtless. Despite not having a great deal of clarity on what every single person was wearing that day, B.F. testified that he was "100 percent" certain that the shooter was shirtless. He did not recall telling detectives that the shooter was six feet tall, but noted that he was crouched down when the gun was pointed at his face. In court, B.F. estimated defendant's height as five feet six inches. B.F. did recall saying that the shooter was wearing a baseball hat and had a long ponytail.

Two other people partially witnessed the shooting. One was a woman who lived in an adjacent apartment complex at Churn Creek Road. On June 25, 2021, she was leaving

---

[2] After watching a video recording of his interview with Detective Weaver, B.F. testified that only one person attacked Patrick B. while he was inside the apartment. After being reminded that he told Detective Moore that he saw two people, B.F. testified that he did "remember saying that" and did "remember that happening."

her apartment when she heard gunshots. As she took cover, she saw two people, possibly a male and a female, get into the passenger side of a black SUV, which then drove away. From her vantage point, the witness could see only the legs of these people.

The other witness, F.S., lived in the same apartment complex as the victim (Patrick B.). On the evening of June 25, 2021, she was retrieving something from the trunk of her car when she heard multiple gunshots. When she looked up, she saw people scattering. Some of the people ran inside the apartments. She saw one man with a pistol run away from the apartment complex and get into the front passenger seat of a vehicle, which sped away. At trial, F.S. did not recall what kind of car or what color it was.

B.     *The 911 Calls*

Shortly after 9:00 p.m. on June 25, 2021, Redding Police received a series of 911 emergency calls from Mary V. The 911 calls were played for the jury.

During the 911 calls, Mary V. told the dispatcher that her husband had just been shot by the "neighbor across the street." She did not know the suspect's name but said "[w]e know exactly [what] he looks like." In the background, B.F. can be heard saying, "I know what the dude looked like." "I know it was the dude, the ro- I know. If you show me his face, I know which one it was." Mary V. described the suspect as an "Asian dude" with "long hair," "very skinny, thin" and "very . . . short." She described him as wearing a "blue shirt with . . . black shorts." She told the dispatcher that the suspect "doesn't live in the complex." She did not know where the suspect went after the shooting. She said the suspect drives a burgundy Honda SUV, but the car belongs to someone else, and she did not believe the suspect left in that vehicle.

Later in the call, Mary V. told the dispatcher that the suspect was leaving in the burgundy Honda SUV. She added that the police needed to stop the car because the suspect "might . . . be in [it]." At trial, she explained that she wanted the police to stop whoever was leaving "in case" the suspect was in the car.

C.      *Initial Investigation at the Crime Scene*

Redding Police responded to the apartment complex around 9:10 p.m. on June 25. Upon entering the victim's apartment, officers saw Patrick B. lying on the living room floor with an apparent gunshot wound to his right side.  Patrick B. was transported to the hospital, where he died.

Detectives documented the crime scene and collected evidence, including empty shell casings and an unspent cartridge.  They located what appeared to be bullet strikes close to the front door of the apartment and near the window of A.B.'s bedroom.

Based on information gathered from witnesses, officers obtained search warrants for two neighboring apartments where the suspect could have been hiding.  After some delay, Cheng and a female exited from one apartment.  The other apartment, which belonged to Baelee, was empty.

D.      *The Police Interview at the Hospital*

Later that evening, Redding Police Officer Ray Maready spoke with Mary V., B.F., and A.B. in the hospital parking lot.  Officer Maready recorded the conversation on his body camera.  During that conversation, Mary V. and B.F. described the shooter as a skinny male with a long ponytail and a blue baseball cap.  Officer Maready then asked if they knew what the suspect was wearing.  A.B. interjected, "I know," and then proceeded to tell the officer that the shooter had his shirt off and was wearing blue shorts.  As they continued talking, B.F. started watching Mary V.'s cell phone video.  B.F. exclaimed,  "This is everybody right here.  My god, this is everybody."  Officer Maready asked, "Who's the shooter?"  B.F. pointed out the shooter, "Right here[,] right–he's the–see with the no t-shirt?  He got a ball cap on right there.  Blue shorts right there.  Right in the back.  That guy right there."

At trial, Mary V. initially could not remember whether she watched the cell phone video in the hospital parking lot.  After her recollection was refreshed, she remembered that they had watched the video.  A.B. could not recall if she watched the video in the parking lot.

E.     *Interviews at the Police Station*

After speaking with Officer Maready in the hospital parking lot, Mary V., B.F., and A.B. went to the Redding Police station for interviews. Video clips from the interviews were shown to the jury.

Upon arrival at the police station, Mary V., B.F., and A.B. were left alone in an interview room. Mary V. initially did not recall if they had talked about the cell phone video during that time. However, after her recollection was refreshed, Mary V. recalled that she and B.F. had discussed the video while they were alone. Mary V. testified that she and B.F. also talked about the video after they left the police station.

Corporal (formerly Detective) Brian Moore interviewed B.F. alone for approximately eleven minutes. Corporal Moore described B.F. as "an emotional roller coaster." Corporal Moore asked B.F. if he could identify the shooter, and B.F. described the shooter as wearing a tank top and shorts, or possibly jeans, with a baseball cap and a ponytail. B.F. estimated the shooter was about six feet tall. Corporal Moore testified that it was not uncommon for witnesses to give incorrect estimates of distances, heights, weights, et cetera.

Corporal Moore also separately interviewed Mary V., with A.B. present. Corporal Moore asked for a description of what the shooter was wearing, and Mary V. responded he was wearing a "darker color" (which seems to be a reference to the color of his hat), no shirt, and long pants. A.B. interjected, "No, I think it was just, like shorts, but it was, like light blue, and his hat was kinda, like dark blue."

Mary V. was also interviewed by Detective Dave Chapman. A.B. was present for the entire interview,[3] but she appeared to doze off at times. B.F. was present for portions of the interview.

_____

[3]     Detective Chapman testified that while typically they preferred to put witnesses in separate rooms, he thought it was reasonable to leave A.B. with her mother. Additionally, the police had some "manpower issues" since there were only a couple of detectives at the station. Corporal Moore added that B.F. had just been through a very traumatic incident and

8

During the Detective Chapman interview, Mary V. provided a description of several individuals associated with the incident. Mary V. identified "L" (Cheng) as the person who fought with Patrick B. She described him as Hmong, early to mid-40's, bald, multiple tattoos, about five feet six or five feet seven inches tall, and weighing 150 to 160 pounds. At the time of the shooting, she said "L" (Cheng) was wearing darker bottoms, possibly pants, and was shirtless.

Mary V. described Baelee as a Hmong male in his late 20's or early 30's, weighing about 170 to 180 pounds, and bald on the top portion of his head with a ponytail. He was shirtless and wearing red and blue colored basketball-style shorts.

Mary V. did not know the names of the other individuals in the group, but she told Detective Chapman that she could identify the shooter if she saw him. Mary V. described the shooter as a Hmong male in his early 20's, about five feet two inches tall, slim, weighing about 115 pounds, with a ponytail. She said the shooter was wearing a dark blue baseball cap, no shirt, and a darker bottom. She could not recall if he was wearing shorts or pants. Mary V. associated the shooter with a burgundy-colored Honda SUV. Mary V. had seen the shooter around the apartment complex with Cheng and Baelee. Mary V. believed that the shooter lived in or visited one of the apartments in the complex.

At some point, Detective Chapman learned of the video Mary V. had recorded on her cell phone. Detective Chapman made a copy of the video and took still photos of the individuals in the video. Mary V. and B.F. watched the video and identified Baelee, Cheng, Cheng's wife, and the shooter.

During the interview, Detective Chapman asked Mary V. if the shooter ever pointed the firearm at her, and she answered no. Nevertheless, Mary V. said that she feared for her life and safety and believed the suspect was going to shoot her and B.F.

---

"there's times in police work that the human element outweighs the policies and procedures of being an officer."

On June 27, 2021, Corporal Moore met again with B.F. to show him A.B.'s cell phone video. An audio recording of the conversation was played for the jury. At approximately two minutes and 20 seconds into the video, Corporal Moore gestured to an individual standing behind a silver car wearing a dark blue baseball cap. B.F. focused on the individual and then excitedly cried out, "[T]hat's him, that's him right there." Corporal Moore asked, "That's the guy who shot?" B.F. confirmed, "I'm 100 percent." B.F. added, "You don't forget the face of somebody who got a gun to your face, officer." At the conclusion of the interview, Corporal Moore told B.F., "Okay, that's what we [thought,] we [just] had to make sure."

F.     *Further Investigation of the Shooter*

Nicholas Weaver, a former Redding Police Officer, responded to the crime scene and obtained the video surveillance from the apartment complex. From the surveillance footage, Weaver identified a gray or silver colored SUV as possibly related to the shooting. Weaver showed a photograph of the gray/silver SUV to F.S., the resident who claimed to have partially witnessed the shooting. According to Weaver, F.S. identified the vehicle as the same one the gunman entered on the night of the shooting. Police later identified the SUV as a 2011 Toyota RAV4 with a Minnesota license plate.

A few days after the shooting, Weaver spoke to F.S. again and showed her Mary V.'s cell phone video. F.S. did not recognize anyone in the video. In the first interview, F.S. had told Weaver that she would be able to identify the person with the firearm if she saw him, but in the second interview, F.S. had said she would not be able to identify the person because it was dark, and she did not see his face.

On July 5, 2021, Weaver interviewed S.T. S.T. lives in the apartment complex where the shooting occurred. He is married to Cheng's wife's sister. At around one minute and 41 seconds into A.B.'s cell phone video, S.T. is speaking to the person whom B.F. had identified as the shooter. Weaver asked S.T. to identify that person. S.T. identified the person using the name "Sus" or "Suspect," which he believed to be a nickname. At trial,

S.T. identified defendant as the person in the cell phone video whom he referred to as "Sus" or "Suspect."

G.     *The Photo Lineups*

After the initial interviews, the police identified defendant as a suspect and obtained a photograph of him from someone in the Minnesota Department of Corrections.  On July 7, 2021, Mary V. and A.B. participated in photo lineups.  The photo lineups were conducted by Detective Ryan Rockwell, a detective unfamiliar and uninvolved with the investigation.

Mary V. was shown an array of six photos and identified defendant as the shooter. She described her level of certainty as "about 99 percent sure."

A.B. was shown the same photo array, and she separately identified defendant as the shooter.  A.B. said she was sure because "I've seen his face before."

A day later, B.F. participated in his own separate photo lineup.  B.F. was unable to provide a definitive identification, noting that the hairstyles were different.  However, he noted that the photo of defendant (photo three) was "the closest one."

Before each photo lineup, the witness was given an admonition.  For Mary V. and A.B., the detective read the admonition aloud.  Among other things, the witnesses were admonished:  "This group of photographs may or may not contain a picture of the person who committed the crime now being investigated" and "[y]ou do not have to identify anyone."  They also were advised to "make up your own mind and not be influenced by other witnesses," and to "pay no attention" to any difference in the type or style of photographs.  After the photo lineups, Detective Chapman sent Mary V. photos of the person who Mary V. and A.B. had chosen.

Audio and video recordings of the photo lineups were made for each witness and played for the jury.

H.     *Investigation of the Vehicle Associated with the Shooting*

As the investigation progressed, the police focused on the gray/silver Toyota RAV4 as a vehicle potentially connected to the shooting.  Police obtained a search warrant for the

11

vehicle. Inside, they found documents and paperwork belonging to P. X., the brother of S.T.'s wife. They also found an unloaded AR-15 stuffed into a duffel bag in the storage area.

Because the Toyota RAV4 contained an active GPS device, police used a program to retrieve the device's location data on the night of the shooting. The data showed that the GPS device arrived at the apartment complex around 8:35 p.m. on the night of the shooting and left the apartment complex at 9:06 p.m., shortly after the 911 calls were made. The GPS device then traveled to several locations, including crossing over South Bonnyview Bridge, before entering the parking lot of a Motel 6 around 9:22 p.m.

At the motel, an individual wearing all blue, later identified as P. X., exited the driver's side of the vehicle, entered the motel lobby, and spoke with the attendant before returning to the vehicle and leaving the parking lot around 9:31 p.m.

A desk agent from the motel testified that he recalled giving the individual in blue the standard advisement that everyone staying in the room must have valid identification. The individual in blue promptly left the lobby.

The Toyota RAV4, a Honda Pilot, and another vehicle were processed for fingerprint and DNA evidence. A number of latent fingerprints were recovered from the Honda and the Toyota RAV4. Some of the prints were a match to P. X., but none were a match to defendant. The DNA results were either inconclusive or excluded defendant as a contributor.

I.      *Recovery of the Weapon*

Because the GPS device crossed South Bonnyview Bridge, law enforcement searched the river below the bridge and located a Glock nine-millimeter pistol with an extended magazine. A criminalist determined the Glock nine-millimeter pistol was the weapon that fired the cartridges found at the crime scene. A latent print analysis was performed, but no usable prints were found. The gun was also swabbed for DNA. The testing results showed limited support or exclusion of defendant as a contributor.

12

Cartridge casings and cartridges found at the crime scene were also examined for DNA evidence by law enforcement investigators, but not enough genetic material was found to perform an analysis. A private forensic analyst found some genetic material, but the results were inconclusive as to whether defendant was a contributor.

J.      *The Autopsy*

A forensic pathologist performed an autopsy on Patrick B. on July 7, 2021. The pathologist found two gunshot wounds, both of which were fully perforating wounds fired at a downward angle. The lethal bullet entered the left side of Patrick B.'s chest. The nonlethal bullet entered and passed through Patrick B.'s upper left arm.

K.      *Defense Case*

Doctor Mitchell Eisen, a psychologist, testified for the defense as an expert in the field of eyewitness memory and suggestibility. Doctor Eisen did not interview the witnesses in the instant case. Instead, he testified generally about how memory works, including the changeable nature of human memory, the limitations of humans to "take in" details all at once, and how gaps in memory are filled. Doctor Eisen identified factors associated with a strong eyewitness identification: e.g., a quick, confident selection in a nonsuggestive, six-pack photo array. He also described factors that might weaken an eyewitness identification, such as suggestive procedures, traumatic stress, the passage of time, vulnerability to postevent information, the influence of other witnesses, the "carryover" effect of repeated exposures, the risk of comparative judgments, witness commitment, and confirmation bias.

Doctor Eisen distinguished between "estimator variables," such as traumatic stress, which must be evaluated on a case-by-case basis to determine how they affect a witness, and "systemic variables," which concern the procedures and circumstances surrounding the identification decision. Doctor Eisen explained that systemic variables are "more definitive in their . . . effect" on the identification. When suggestive identification procedures are used, a high degree of confidence is not associated with accuracy.

L.      *Verdict and Sentencing*

A first amended information charged defendant with the following crimes:  In count 1, the murder of Patrick B. (Pen. Code,[4] § 187, subd. (a)); in counts 2, 3, and 4, assault with a semiautomatic firearm upon B.F., Mary V., and A.B. (§ 245, subd. (b)); in count 5, child abuse under circumstances or conditions likely to cause great bodily injury or death against A.B. (§ 273a, subd. (a)); in count 6, shooting at an inhabited dwelling (§ 246); in count 7, first degree residential burglary with a person present (§ 459); and in count 8, possession of a firearm by a felon (§ 29800, subd. (a)).  The information further alleged:  as to count 1, personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and personal infliction of great bodily injury (§ 12022.7, subd. (a)); as to counts 2, 3, 4, 5, and 7, personal use of a firearm (§ 12022.5, subd. (a)); as to all counts, that defendant previously was convicted of a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12); and, as to counts 1, 2, 3, 4, 6 and 7, that the prior conviction qualified defendant for a five-year enhancement under section 667, subdivision (a).  The information also alleged several factors in aggravation.

On June 14, 2023, the jury found defendant not guilty on count 1 of first degree murder, but guilty of the lesser crime of second degree murder.  The jury found true the associated firearm allegation under section 12022.53, subdivision (d).  The jury further found defendant guilty of all remaining charges and found true the allegations associated with those charges.  In a bifurcated proceeding, the trial court found true the prior serious felony conviction allegations.  The court also made findings regarding factors in aggravation and mitigation.

On July 14, 2023, the trial court declined to strike the prior serious felony conviction and denied probation.  The court sentenced defendant to an aggregate prison term of 33 years plus 55 years to life.  The indeterminate term for count 1 (§ 187, subd. (a)) consisted

**4**      Undesignated section references are to the Penal Code.

14

of 15 years to life, doubled to 30 years to life under the three strikes law, plus 25 years to life for the firearm enhancement. The determinate term consisted of the following: For count 2 (§ 245, subd. (b)), a consecutive middle term of six years, doubled to 12 years under the three strikes law, plus the middle term of four years for the section 12022.5, subdivision (a) enhancement. For each of counts 3 and 4 (§ 245, subd. (b)), a consecutive term of two years (one-third the middle term of six years), doubled to four years under the three strikes law, plus sixteen months (one-third the middle term of four years) for the firearm enhancement. For count 5 (§ 273a, subd. (a)), the middle term of four years, doubled to eight years under the three strikes law, plus the middle term of four years for the section 12022.5, subdivision (a) enhancement, all stayed pursuant to section 654. For count 6 (§ 246), the middle term of five years, doubled to 10 years under the three strikes law, stayed pursuant to section 654. For count 7 (§ 459), the middle term of four years, doubled to eight years under the three strikes law, plus the middle term of four years for the section 12022.5, subdivision (a) enhancement, all stayed pursuant to section 654. For count 8 (§ 29800, subd. (a)), a consecutive term of eight months (one-third the middle term of two years), doubled to 16 months under the three strikes law. The court additionally imposed a five-year enhancement for the prior serious felony conviction (§ 667, subd. (a)(1)). Defendant filed a timely notice of appeal.

DISCUSSION

I

*Sufficiency of the Evidence for Count 1 (Murder)*

Defendant contends that his murder conviction is not supported by substantial evidence because the eyewitness identifications of him were unreliable. He argues that convicting him based on unreliable eyewitness testimony violated his right to due process. We conclude that the record contains substantial evidence to support defendant's conviction.

15

A.      *Standard of Review*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) In making this determination, we view the facts in the light most favorable to the judgment, drawing all reasonable inferences in support of the conviction. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*Ibid*.) The test on appeal is not whether we believe the evidence proves the defendant's guilt beyond a reasonable doubt, but whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*Ibid*.) Given our limited role on appeal, the defendant bears an "enormous burden" in showing there is insufficient evidence to sustain a conviction. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

B.      *Analysis*

Defendant argues that because there was no physical evidence connecting him to the shooting, such as fingerprints or DNA, the prosecution's case hinged solely on the eyewitness identifications by the victim's family members. Defendant claims those identifications were so flawed and "unreliable" that they could not be considered substantial evidence. We disagree.

Viewing the evidence in the light most favorable to the prosecution, we find ample evidence to support defendant's conviction. It is well settled that a single witness's identification may be sufficient to prove a defendant's identity as the perpetrator of the crime. (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411.) Here, defendant was identified not just by one witness, but by three. Mary V., A.B., and B.F. each identified defendant as the shooter, in pretrial interviews and in court. Both Mary V. and B.F. testified that they had

16

"no doubt" defendant was the shooter. Mary V. and A.B. also quickly and decisively picked defendant out in a pretrial photo lineup. And while B.F. was unable to provide a definitive identification at his photo lineup, B.F. noted that defendant's photo appeared to be "the closest." This alone would constitute sufficient evidence to support the conviction. There is, however, additional evidence upon which a rational trier of fact could have relied in finding that defendant was the perpetrator of the crime.

For example, a reasonable juror could have considered that the initial description of the shooter during the 911 call—a short, thin, Asian male with a long ponytail—matched defendant's appearance. The jury also could have found it significant that when B.F. *first* watched Mary V.'s cell phone video in the hospital parking lot, he immediately recognized the shooter in that video, exclaiming: "Right here[,] right–he's the–see with the no t-shirt? He got a ball cap on right there. Blue shorts right there. Right in the back. That guy right there." Because the event was recorded, the jury was able to see B.F.'s reaction and independently assess B.F.'s credibility.

Defendant asserts that the reliability of this evidence was undermined by the traumatic stress of the incident, the passage of time, the influence of other witnesses, and the effect of repeated viewing of the cell phone videos. Defendant also stresses that there were certain inconsistencies (relating to the shooter's clothing and height) in the witnesses' initial descriptions to the police. However, these factors go to the weight of the evidence, not its sufficiency. (*People v. Elwood* (1988) 199 Cal.App.3d 1365, 1372; *People v. Prado* (1982) 130 Cal.App.3d 669, 674; *People v. Fagalilo* (1981) 123 Cal.App.3d 524, 530.)

The jury heard the testimony, viewed the lineups and pretrial identifications, and saw the defendant in person. Factors relating to the reliability of the eyewitness identifications were brought to the jury's attention by Doctor Eisen's expert testimony, cross-examination, and defense counsel's arguments. During closing arguments, both attorneys argued at length why the witness identifications were or were not unreliable, discussing concepts such as hindsight bias, witness conformity, and carryover effect. In addition, the trial court

17

instructed the jury on the factors relevant to evaluating a witness's credibility and the reliability of a witness's identification.

Under the circumstances, we are not persuaded that any of the factors on which defendant relies rendered the eyewitness accounts so weak or unconvincing that no rational juror could rely on them. Rather, the credibility of the eyewitnesses and the weight to be given to their testimony were matters for the jury's determination. (*People v. Elliott* (2012) 53 Cal.4th 535, 585; *Foster v. California* (1969) 394 U.S. 440, 442, fn. 2.) We are not free to second-guess the jury's findings. (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521; *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.)

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Accordingly, the due process clause is satisfied. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156.)

II

*Sufficiency of the Evidence for Count 4 (Assault with Firearm)*

In count 4, the jury found defendant guilty of assault of A.B. with a semiautomatic firearm, in violation of section 245, subdivision (b). Defendant argues that his conviction for this offense is not supported by substantial evidence and therefore violates due process. We disagree.

To prove a violation of section 245, subdivision (b), the prosecution must establish the following elements: (1) the defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did that act willfully; (3) when the defendant acted, he/she was aware of facts that would lead a reasonable person to realize that his/her act by its nature would directly and probably result in the application of force to someone; and (4) when the defendant acted, he/she had the present ability to apply force with a semiautomatic firearm to a person. (CALCRIM No. 875.) Because assault with a semiautomatic firearm is a general intent

18

crime, it does not require proof of a specific intent to injure a particular person. (*People v. Williams* (2001) 26 Cal.4th 779, 782.) It requires only "an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id.* at p. 790.) "Assault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime." (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263; see also *People v. Trujillo* (2010) 181 Cal.App.4th 1344, 1353-1357 [defendant could be convicted of assault against both occupants of a car even if defendant did not actually see the passenger in the back seat]; *People v. Bland* (2002) 28 Cal.4th 313, 329 [defendant may commit multiple assaults with a single shot]; *In re Tameka C*. (2000) 22 Cal.4th 190, 196 [same].)

Defendant argues that his conviction for this count was not supported by sufficient evidence because the evidence established that A.B. was inside the apartment when the shots were fired and was in her bedroom by the time the shooter entered the apartment. Absent evidence that defendant was "aware of A.B.'s presence" at the time of the shooting, defendant contends he could not have had the necessary intent or present ability to assault her.

Leaving aside that the crime of assault with a semiautomatic firearm does not require a specific intent to injure the victim, defendant's argument fails the substantial evidence test. As defendant acknowledges, the parties gave "conflicting testimony regarding A.B.'s location at the time of the shooting as well as . . . the time that the shooter entered the apartment." Viewing the evidence in the light most favorable to himself, defendant would have us credit the evidence placing A.B. outside the zone of harm and disregard the evidence that supports a contrary finding. However, as we have previously described, our function is not to reweigh or reinterpret the evidence, but to determine only whether the record contains sufficient evidence to warrant the inference of guilt drawn by the jury.

19

(*People v. Lindberg*, *supra*, 45 Cal.4th at p. 27; *People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

Viewing the evidence in the light most favorable to the judgment, as we must, we conclude there was substantial evidence from which the jury could conclude that A.B. was in the zone of harm, either when the shooting occurred or when defendant was pointing the gun inside the apartment. The jury reasonably could have credited Mary V.'s testimony that A.B. was outside when the shooting started or that the shooter subsequently pointed his gun at them. Or it could have credited B.F.'s testimony that A.B. was pushed inside the apartment as the shooting started. Or it could have credited A.B.'s testimony that the shooter pointed the gun at her and others.

We acknowledge there were conflicts and ambiguities in the evidence, but these were issues for the jury to resolve. (*People v. Tice* (2023) 89 Cal.App.5th 246, 256 [substantial evidence does not mean evidence free of ambiguities or inconsistencies]; *People v. Maury* (2003) 30 Cal.4th 342, 403 [conflicts and even testimony which is subject to justifiable suspicion does not justify reversal of a judgment].) Here, the jury resolved these conflicts in favor of the prosecution. That the evidence reasonably might also have supported a contrary conclusion is immaterial. (*People v. Lewis* (2001) 25 Cal.4th 610, 643-644; *People v. Casares* (2016) 62 Cal.4th 808, 827, disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Defendant's conviction for assault of A.B. with a semiautomatic firearm must stand.

III

*Sufficiency of the Evidence for Count 5 (Child Abuse)*

The jury found defendant guilty in count 5 of child abuse under circumstances likely to result in great bodily injury or death, in violation of section 273a, subdivision (a). Defendant contends the jury's verdict is not supported by substantial evidence because there is no evidence that defendant was "aware of the presence of a child, an essential element for [the offense]." We conclude that substantial evidence supports the jury's verdict.

20

Section 273a, subdivision (a), which establishes the crime of felony child abuse, " 'is an omnibus statute that proscribes essentially four branches of conduct.' " (*People v. Valdez* (2002) 27 Cal.4th 778, 783.)  As relevant here, it prohibits any person, under circumstances or conditions likely to produce great bodily harm or death, from willfully causing or permitting any child to suffer unjustifiable physical pain or mental suffering.  (§ 273a, subd. (a).)  This section is intended to protect children from abusive situations in which the probability of serious injury is great, as well as situations in which great bodily injury actually results.  (*Valdez*, at p. 784.)

Section 273a, subdivision (a), expressly requires no specific mental state other than willfulness, which has varying meanings depending on the statutory context.  (*People v. Valdez*, *supra*, 27 Cal.4th at pp. 787-788, 790.)  When, as here, the harm to the child is indirectly inflicted, case law establishes that the requisite mental state for a violation of section 273a is criminal negligence.  (*People v. Burton* (2006) 143 Cal.App.4th 447, 454; *Valdez,* at pp. 786-790.)  "Criminal negligence is aggravated, culpable, gross or reckless conduct that is such a departure from that of the ordinarily prudent or careful person under the same circumstances as to be incompatible with a proper regard for human life.  [Citation.]  A defendant may be deemed to be criminally negligent if a reasonable person in his or her position would have been aware of the risk."  (*Burton*, at p. 454.)  In *Burton*, we held that a parent may be convicted of felony child abuse under section 273a by engaging in serious domestic violence while aware that his or her child is at the scene, even if the child does not see the actual attack.  (*Burton*, at pp. 453-456.)  The jury in this case was instructed in accordance with these principles, pursuant to CALCRIM Nos. 253 and 821.

Defendant argues that a finding of willful infliction of harm upon a child is necessarily predicated on the defendant's knowledge of the child's presence at the time of the injurious act(s).  Defendant contends that his conviction was not supported by sufficient evidence because there was no evidence that he was aware of A.B.'s presence.  We are unpersuaded.

21

For the reasons discussed in Part II of the Discussion, *ante*, we find there was substantial evidence from which a reasonable jury could conclude that defendant was aware of A.B.'s presence when he was firing the pistol and/or when he was pointing the pistol at A.B. or her family. Defendant's arguments to the contrary are nothing more than an invitation to reweigh the evidence and substitute our judgment for that of the jury, which we cannot do. (*People v. Lashley*, *supra*, 1 Cal.App.4th at p. 946.)

DISPOSITION

The judgment is affirmed.

\\s\\
Krause, J.

We concur:

\\s\\
Earl, P. J.

\\s\\
Mesiwala, J.